UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CHARLES E. CAMPANELLA, II,
DEBORAH S. CAMPANELLA,

                                        Plaintiffs,

                                                        DECISION AND ORDER

                                                        10-CV-6236L

                v.

THE COUNTY OF MONROE,
MONROE COUNTY SHERIFF'S OFFICE,
MONROE COUNTY SHERIFF  PATRICK M. O'FLYNN,
MONROE COUNTY UNDERSHERIFF  GARY CAIOLA,
CHIEF DEPUTY STEVEN SCOTT,
LIEUTENANT LOU TOMASSETTI, and other known
or unknown members of the Monroe County
Sheriff's Office, individually and in their
official capacities,

                                        Defendants.
_____

        This civil rights action was brought by a husband and wife, Charles and Deborah Campanella

("plaintiffs") under 42 U.S.C. § 1983.  Plaintiffs have sued The County of Monroe ("County"), the

Monroe County Sheriff's Office ("MCSO"), and four individuals, alleging that defendants have

violated plaintiffs' constitutional rights.   In short, plaintiffs allege that Charles Campanella

("Campanella") is a deputy sheriff in the MCSO, and that defendants, all of whom are officials or

employees of the MCSO, have taken adverse actions against him in connection with his job.

Plaintiffs allege that defendants have done so in retaliation for Deborah Campanella's employment

with a company owned by a political rival of defendant Patrick O'Flynn, the Monroe County Sheriff.

        Defendants have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal

Rules of Civil Procedure.  Plaintiffs have cross-moved for an award of attorney's fees under 28

U.S.C. § 1927.

**BACKGROUND**

According to the complaint, Deborah Campanella ("Deborah"), who for some time had been involved in the local Republican Party, began working in June 2008 for Leader Security Services, Inc. ("Leader").  The founder and president of Leader was Daniel R. Greene, a former Monroe County undersheriff who resigned from the MCSO in 2007.  Apparently Greene had previously been a member of the Republican Party, but at some point changed parties and became the Democratic Party candidate for sheriff in 2009.  Greene's opponent in the election would be O'Flynn, who was running for re-election as the Republican candidate.

Plaintiffs allege that in August 2008, MCSO Investigator Scott Walsh approached Campanella and warned him that Undersheriff Gary Caiola had made comments about the actual or perceived connection between Campanella and Greene, saying, "in sum," "Are we going to have trouble with this Campanella kid?," "What's this kid doing with Greene?," and "What's his affiliation with Leader?"  Complaint ¶ 20.  Walsh also informed Campanella that O'Flynn and Caiola were "watching everyone" at Leader, that they monitored Leader's website on a daily basis, and that Caiola had told Walsh that "Leader was going to 'go down' along with everyone associated with it."  Complaint ¶ 20.

Around September 2008, Campanella was informed by Chief Deputy Stephen Scott that "MCSO would repost his position as C-Zone 'Crime Prevention Officer' ('CPO') and reassign" him to a different position.  Complaint ¶ 21.  It is not clear from the complaint if Campanella was actually reassigned at that time, or simply informed that he was going to be reassigned at some later date, but he alleges that this was contrary to the usual practice at MCSO, in that deputies were typically not reassigned for non-disciplinary reasons.  *Id.*

Plaintiffs also allege that in October 2008, Scott sought to remove Campanella from his participation in the "Operation Safe Child" program.  Although Scott's request was denied initially by the state, Scott was ultimately successful, and Campanella was replaced by another deputy in

Operation Safe Child around July 2009.  Campanella lost some earnings as a result.  Complaint ¶¶ 24-26.

In October 2008, Campanella met with Sheriff O'Flynn to discuss these events, which he perceived as retaliation for Deborah's employment at Leader.  During this meeting, O'Flynn allegedly told Campanella that while Deborah Campanella could "work for whomever she likes, ... [t]he problem is that if Dan [Greene] is going to run, then that puts you in a box, ... [b]ecause then it will be a problem for you and your wife, and your working here.  It's going to be tougher on your wife being in the Republican Party if he's going to run."  Complaint ¶ 28.

Around February 2009, Campanella was informed that he was being reassigned to the C-Zone night shift effective March 7, but before that date arrived, Scott "changed his mind" and assigned Campanella to the Crime Prevention unit.  Scott later again reassigned Campanella to firearms training and yet again to the C-Zone morning shift.[1]  Plaintiffs allege that all these reassignments were retaliatory, although they do not articulate how or why.

In April 2009, plaintiffs attended a social event at which they discussed how O'Flynn and Caiola had allegedly compelled Court Deputy DiPonzio to provide a doctor's note when he wanted to take time off from work after DiPonzio's son, a Rochester police officer, had been severely wounded in the line of duty.  A sergeant in the MCSO (who is not a defendant here) "eavesdropped" on plaintiffs' conversation and reported it to his superiors.  Complaint ¶ 32.

This led to an internal investigation, primarily conducted by Scott, into a potential charge of "gossip" against Campanella.  Scott and Investigator Pat Crough also looked into whether Campanella had discussed with anyone the ongoing investigation into Robutrad, a local company (now defunct) that had contracts to perform work for the County, but which allegedly had its employees work, while on the County "clock," on private jobs for County officials and other

---

[1]It is not clear from the complaint if all these reassignments actually took place, or if they were simply proposed and then rescinded before they could be implemented.  *See* Complaint ¶ 31.

politically connected individuals.  This federal investigation later resulted in state and criminal charges filed against several County employees.

The internal investigation led in May 2009 to the issuance of a "memorandum of record" ("MOR") against Campanella.  The MOR, which was written by Lt. Lou Tomassetti, charged Campanella with violating MCSO rules concerning gossip, "conduct unbecoming," and "truthfulness."  The "gossip" and "truthfulness" charges related to the DiPonzio matter, and although the MOR did not mention Robutrad by name, plaintiffs allege that the "conduct unbecoming" and "truthfulness" charges related to the Robutrad investigation.  Complaint ¶34.

Plaintiffs allege that MCSO procedures were not followed during the preparation of the MOR.  They allege that an MOR is supposed to be preceded by "coaching and counseling," neither of which occurred here.  Plaintiffs also allege that Tomassetti later tried to make the record appear, falsely, as if Campanella had been offered counseling in connection with the MOR.  Complaint ¶¶ 35, 36.

On May 27, 2009, Campanella wrote a "special report," addressed to Tomassetti, responding to the MOR.  Plaintiff asserted that the MOR was unjustified and asked that it be rescinded. Complaint ¶ 37.  The complaint does not state what, if any, action was taken in response to Campanella's "report."

In June 2009, Campanella unsuccessfully applied for a firearms training position that had recently become vacant.  It is not clear if that was the same firearms training position that Scott is alleged to have temporarily reassigned Campanella to.  *See* Complaint ¶ 31.  Campanella had applied for and been turned down for the position in the past, but on those occasions the position was given to employees with more seniority.  This time, the position was awarded to a deputy with less seniority than Campanella.  Complaint ¶ 38.

Through his union, Campanella grieved this matter.  The grievance was denied, and after plaintiff, through his union, requested arbitration, a hearing was held before an arbitrator, who had been jointly selected by the parties, in October 2011.

In January 2012, the arbitrator issued a decision denying the grievance.[2]  Plaintiff's principal claim had been that he should have been awarded the position based on his seniority, but the arbitrator found that under the terms of the collective bargaining agreement governing plaintiff's employment, seniority was not required to be considered as a factor with respect to the position in question.  Dkt. #23 at 9-10.[3]

Campanella also alleges that he has repeatedly been denied overtime work ever since these events began.  Complaint ¶ 42.  He states that he also "fears additional retaliation based on conversations with fellow deputies ... ."  Complaint ¶ 43.

Based on these allegations, plaintiffs have sued the County, the MCSO, Sheriff O'Flynn, Undersheriff Caiola, Deputy Scott, and Lt. Tomassetti.  Plaintiffs assert seven claims:  (1) by both plaintiffs against all defendants for violating plaintiffs' First Amendment rights to free speech and free association; (2) by Charles Campanella against all defendants for violating his due process rights; (3) by Charles against all defendants for libel, (4) slander and (5) defamation per se; (6) by

_____

[2]Since the arbitration decision was not issued until after the complaint in this action was filed, it is outside the pleadings.  The arbitration proceeding itself is referenced in the complaint, however, *see* Complaint ¶¶ 39-41, and therefore the decision may fairly be considered by the Court as integral to plaintiffs' claim.  *See Mayo v. Board of Educ. of Prince George's County*, 797 F.Supp.2d 685, 689 n.3 (D.Md. 2011).  In any event, the Court references the arbitrator's decision only by way of factual background, and I have not relied on the substance of the arbitrator's findings in reaching my decision here.

In that regard, however, I note that both plaintiffs and defendants have submitted copies of other documents that *are* referenced in the complaint, such as the MOR and Campanella's "special report" in response.  Such documents may properly be considered on a Rule 12(c) motion, without converting the motion to a motion for summary judgment under Rule 56.  *See Virgil v. Town of Gates*, No. 10-4971-CV, 2012 WL 29273, at *1 (2d Cir. Jan. 6, 2012) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)); *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011); *Rivera v. Lempke*, ___ F.Supp.2d ___, 2011 WL 4071987, at *5 n.2 (W.D.N.Y. 2011).

[3]The arbitrator also stated that there was no evidence to support Campanella's testimony that he was "refused this assignment because of his wife's former employment with the Employer."  *Id.* at 10.  The attorneys have submitted letters to the Court, addressing whether and to what extent the Court should adopt or give any weight to that finding.  For purposes of the present Decision and Order, the Court has not considered the arbitrator's findings in this regard.  Whether those findings can properly be considered at some later point, either on a motion for summary judgment or at trial, can be addressed at the appropriate time.

Charles against the County and MCSO for negligent failure to train and supervise MCSO employees; and (7) a claim for attorney's fees under 42 U.S.C. § 1988.

## DISCUSSION

### I. Defamation Claims

Plaintiffs' third, fourth and fifth causes of action allege libel, slander and defamation *per se*, respectively.  All three are based on certain statements contained in the MOR prepared by defendant Tomassetti.  *See* Plaintiffs' Mem. of Law (Dkt. #16) at 16.  The gist of plaintiffs' claims is that Tomassetti falsely accused Campanella of violating MCSO rules concerning gossip, conduct unbecoming an employee, and lying.  *See* Complaint ¶¶ 54-67.

The elements of a cause of action for defamation under New York law are:  (1) a defamatory statement of fact about the plaintiff, (2) that is false, and (3) published to a third party; (4) fault on the part of the speaker (either negligence or actual malice, depending on the status of the libeled party); and (5) either special harm or slander per se.  *Albert v. Loksen*, 239 F.3d 256, 265-66 (2d Cir. 2001); *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 176 (2d Cir. 2000).  Under New York law, words are per se defamatory if they import criminal activity, impute certain types of disease, would tend to injure a party's trade, occupation or business, or impute certain sexual conduct.  *Epifani v. Johnson*, 65 A.D.3d 224, 233-34 (2d Dep't 2009); *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, ___ F.Supp.2d ___, 2011 WL 4035751, at *51-*52 (S.D.N.Y. 2011).

In the case at bar, defendants argue that Tomassetti's statements were protected by the "common interest" privilege.  The law in New York is that "[e]ven though a statement is defamatory, there exists a qualified privilege where the communication is made to persons who have some common interest in the subject matter."  *Foster v. Churchill*, 87 N.Y.2d 744, 751 (1996).  "The rationale for applying the privilege in these circumstances is that so long as the privilege is not

abused, the flow of information between persons sharing a common interest should not be impeded." *Liberman v. Gelstein*, 80 N.Y.2d 429, 437 (1992).

Work-related communications within a workplace about an employee may fall within the scope of the privilege. *See Meloff v. New York Life Ins. Co.*, 240 F.3d 138, 146 (2d Cir. 2001) ("This 'common interest' privilege has been applied to communications within a firm concerning the actions of its employees") (citing *Liberman*, 80 N.Y.2d at 437; *Albert v. Loksen*, 239 F.3d 256, 272 (2d Cir. 2001) ("Communications by supervisors or co-workers made in connection with the evaluation of an employee's performance, including allegations of employee misconduct and communications regarding the reasons for an employee's discharge, fall within the privilege"). When it applies, the privilege covers statements that would otherwise be defamatory per se. *See*, *e.g.*, *Foster*, 87 N.Y.2d at 751 ("We find the statements made by respondents Churchill and Croll ..., although per se defamatory, were protected under the [common interest] privilege").

This defense can "be defeated by demonstrating a defendant spoke with malice." *Foster*, 87 N.Y.2d at 751. *Accord Curren v. Carbonic Systems, Inc.*, 58 A.D.3d 1104, 1107 (3d Dep't 2009). Malice requires a showing that the defendant "acted out of spite or ill will, with reckless disregard for the statements' truth or falsity, or with a high degree of belief that [his] statements were probably false." *Foster*, 87 N.Y.2d at 752. Although, "[a]t the pleadings stage, a plaintiff can overcome the common interest privilege by alleging that the defamatory statement was motivated solely by ... malice," *Thai v. Cayre Group, Ltd.*, 726 F.Supp2d 323, 330 (S.D.N.Y. 2010), some facts must be alleged that support such an allegation. "Mere conclusory allegations, or charges based upon surmise, conjecture, and suspicion are insufficient to defeat the claim of qualified privilege." *Id.* (quoting *Golden v. Stiso*, 279 A.D.2d 607 (2d Dep't 2001)). *See*, *e.g.*, *Panghat v. New York Downtown Hosp.*, 85 A.D.3d 473, 474 (1st Dep't 2011) (defendant's statements were "protected by the common interest privilege," since "[p]laintiff merely asserted in conclusory fashion that the statements at issue were made with malice, which is insufficient to overcome the privilege"), *leave to appeal denied*, ___ N.Y.3d ___, 2012 WL 117992 (Jan. 17, 2012).

In the case at bar, defendants clearly shared a common interest in the subject matter of Tomassetti's statements about Campanella. The entire contents of the MOR dealt with matters relating to Campanella's alleged violation of the rules governing his conduct as an employee of the MCSO. In addition, the MOR was not published to anyone outside the MCSO, but was only provided to plaintiff, O'Flynn, Caiola, Scott, and the MCSO Internal Affairs division, and a copy was placed in plaintiff's personnel file. *See* Plaintiff's Cross-Motion (Dkt. #17) Ex. B. *See Albert v. Loksen*, 239 F.3d 256, 272 (2d Cir. 2001) ("Communications by supervisors or co-workers made in connection with the evaluation of an employee's performance, including allegations of employee misconduct ... , fall within the [common interest] privilege"); *Moore v. New York City Dep't of Educ.*, No. 03 CIV.2034, 2004 WL 691523, at *2 (S.D.N.Y. Mar. 31, 2004) (dismissing defamation claim based on content of report prepared by investigator for city education department, where investigator's "dissemination of the Report to his superiors and the Department's limited internal dissemination of the Report were privileged under the common interest privilege," and plaintiff made no claim that dissemination went beyond that authorized by the privilege);

There is also no indication of malice here. As the Second Circuit has explained, the common-interest privilege

> may be overcome by a showing either of "actual" malice (*i.e.*, knowledge of the statement's falsity or reckless disregard as to whether it was false) or of common-law malice. Common-law malice "mean[s] spite or ill will." "The critical difference between common-law malice and constitutional [*i.e.*, "actual"] malice ... is that the former focuses on the defendant's attitude toward the plaintiff, the latter on the defendant's attitude toward the truth."

*Chandok v. Klessig*, 632 F.3d 803, 815 (quoting *Liberman*, 80 N.Y.2d at 437, and *Konikoff v. Prudential Ins. Co. of America*, 234 F.3d 92, 99 (2000)).

In the case at bar, there was clearly *some* factual basis for Tomassetti's charges and findings. Plaintiffs do not dispute that the conversations that formed the basis for the MOR took place; they simply disagree with Tomassetti's characterization of those conversations as "gossiping," "conduct unbecoming," and so on. That plaintiffs disagree with Tomassetti's conclusions is not enough to

show malice, however, especially since the complaint does not allege any facts indicating that TOMASSETTI acted out of spite, or with reckless disregard for the truth or falsity of the MOR's contents.  *See*, *e.g.*, *Thai v. Cayre Group, Ltd.*, 726 F.Supp.2d 323, 335-36 (S.D.N.Y. 2010) (where plaintiff failed to plead facts to support the inference that defendant's statement was made maliciously and for the sole purpose of defaming her, plaintiff's allegations of malice were not entitled to a presumption of truthfulness and were insufficient to overcome the common-interest privilege); *Hoesten v. Best*, 34 A.D.3d 143, 158 (1st Dep't 2006) ("In order to establish a triable issue regarding common-law malice, a defamed plaintiff must show that a jury could reasonably conclude that the speaker spoke out of spite or ill will, and that such malicious motivation 'was the *one and only cause for the publication*'") (quoting *Stukuls v. State of New York*, 42 N.Y.2d 272, 282 (1977)) (emphasis added); *Sborgi v. Green*, 281 A.D.2d 230, 230 (1st Dep't 2001) ("surmise and accusation are not enough to infer malice").

As stated, plaintiffs' defamation claim appears to be based entirely on Tomassetti's statements in the MOR.  To the extent that the complaint could be read as asserting claims based on any other statements, however, it likewise fails to state a viable claim.

Some statements, such as statements by O'Flynn to plaintiff, were not published to a third party and, therefore, do not constitute defamation.  *See*, *e.g.*, *DiLacio v. New York City Dist. Council of United Broth. of Carpenters & Joiners of America*, 80 A.D.3d 553, 554 (2d Dep't 2011) (plaintiff's defamation claim should have been dismissed, since "[t]he termination letter containing the phrase 'severe dereliction of duty' was not published to anyone other than the plaintiff himself").  Others, such as Caiola's statements about Leader "going down," and "Are we going to have trouble with this kid Campanella?," were not assertions of fact, and therefore could not be considered defamatory.  *See Guerrero v. Carva*, 10 A.D.3d 105, 111 (1st Dep't 2004) ("Since falsity is a necessary element of a libel claim, and only 'facts' are capable of being proven false, it follows that 'a libel action cannot be maintained unless it is premised on published assertions of *fact*'") (quoting

*Brian v. Richardson*, 87 N.Y.2d 46, 51 (1995)). None of these other statements, then, provide the basis for a defamation claim, and these claims must be dismissed.

## II. First Amendment Claims

Plaintiffs' first cause of action asserts a claim under § 1983, alleging that defendants have violated their rights to free speech and free association under the First Amendment to the United States Constitution. The free-speech claim is based on plaintiffs' allegation that Campanella was retaliated against because of Deborah's employment with leader, and because of his conversations with Deborah and others about DiPonzio and Robutrad. Plaintiffs assert that defendants retaliated against Campanella because of those matters.

A public-employee plaintiff pursuing a claim for First Amendment retaliation must demonstrate that (1) his speech addressed (or his associational conduct touched upon) a matter of public concern, (2) he suffered an adverse employment action, and (3) a causal connection existed between the speech (or associational activity) and the adverse employment action, so that it can be said that his protected speech or conduct was a motivating factor in the determination. *Cobb v. Pozzi*, 363 F.3d 89, 102 (2d Cir. 2004) (citing *Mandell v. County of Suffolk*, 316 F.3d 368, 382 (2d Cir. 2003)). Once a plaintiff satisfies these three factors, the governmental employer may avoid liability by showing either (1) that it would have taken the same adverse action regardless of the protected speech or associational conduct, or (2) that the plaintiff's expression was likely to disrupt the employer's activities, and that the likely disruption was sufficient to outweigh the value of the plaintiff's First Amendment expression. *Cobb*, 363 F.3d at 102; *see also Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999), and *Locurto v. Safir*, 264 F.3d 154, 166 (2d Cir. 2001)).

Defendants contend that this claim fails, on a number of grounds. First, they assert that plaintiffs have not alleged that they engaged in protected speech. Defendants also contend that the First Amendment claim must be dismissed as to defendants O'Flynn and Caiola because of their lack of personal involvement in the alleged retaliation. They also argue that there are insufficient facts

alleged to show that defendants Scott and Tomassetti acted for retaliatory reasons, and that the facts alleged do not support a claim against the County.

In evaluating this claim, the Court must remain cognizant of the appropriate standard by which to assess the sufficiency of the complaint. On a Rule 12(c) motion, the Court applies "the same standard as that applicable to a motion [to dismiss] under Rule 12(b)(6). Under that test, a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994). However, "a plaintiff's obligation ... requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). *See also Ashcroft v. Iqbal*, 555 U.S. 662, 129 S.Ct. 1937 (2009).

Although the *Twombly/Iqbal* standard unquestionably heightened the pleading requirements that plaintiffs must meet to survive a motion to dismiss, those requirements should not be turned into "an insurmountable hurdle," particularly where some of the relevant facts are within the exclusive knowledge or control of the defendants. *Burgos v. Satiety, Inc.*, No. 10-CV-2680, 2011 WL 1327684, at *4 (E.D.N.Y. Apr. 5, 2011) (internal quote omitted). The Court must ignore allegations that are no more than legal conclusions, *see Iqbal*, 556 U.S. at ___, 129 S.Ct. at 1949-50; *McCauley v. City of Chicago*, ___ F.3d ___, 2011 WL 4975644, at *4 (7th Cir. 2011) ("After excising the allegations not entitled to the presumption [of truth], we determine whether the remaining factual allegations 'plausibly suggest an entitlement to relief'") (quoting *Iqbal*, 129 S.Ct. at 1951), but the plaintiffs need not plead specific evidence, nor are they barred from pleading facts on information and belief, particularly where the relevant facts are "peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (internal quotation marks and citation omitted).

It is not always necessary, then, for a plaintiff asserting a retaliation claim to *allege* (although he may eventually be required to prove) all the details concerning how defendants formed the intent to, and did, take retaliatory actions against the plaintiff.  The question at this stage is whether plaintiffs have alleged sufficient facts to make such a claim *plausible*.  *Compare Porter v. Valdez*, 424 Fed.Appx. 382, 387 (5th Cir. 2011) (sheriff's department employees sufficiently pleaded a First Amendment retaliation claim, by alleging that they had participated in campaign activities on behalf of sheriff's election opponent, and that shortly after sheriff's reelection, plaintiffs were transferred to allegedly less desirable positions), *with Brooks v. Ross*, 578 F.3d 574, 581-82 (7th Cir. 2009) (plaintiff's allegation that defendants violated "knowingly, intentionally, and maliciously" retaliated against him for exercising his constitutional rights simply recited the elements of a § 1983 cause of action, and thus did not put the defendants on notice of what they did to violate the plaintiff's constitutional rights).

"Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011) (quoting *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009)).  "Plausibility thus depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable."  *Id.*

Applying that standard to the case before me, I conclude that with respect to their free-association claim, plaintiffs have done more than simply present "the type of general allegations, devoid of any factual enhancement, that the court[] in *Iqbal* ... rejected as conclusory." *A.B. ex rel. Kehoe v. Housing Authority of South Bend*, No. 3:11 CV 163, 2011 WL 4005987, at *5 (N.D.Ind. Sept. 8, 2011) (citing *Iqbal*, 129 S.Ct. at 1951).  Accepting the truth of plaintiff's factual allegations, I find that plaintiffs have "give[n] enough details about the subject-matter of the case to present a story that holds together." *McCauley*, ___ F.3d at ___, 2011 WL 4975644, at *4 (quoting *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010)).

- 12 -

I also find that plaintiffs have alleged sufficient facts to defeat defendants' motion as to one aspect of their free-speech claim, concerning Campanella's alleged statements about the Robutrad investigation.  As to plaintiffs' alleged conversation concerning Court Deputy DiPonzio, however, Plaintiffs have failed to show that they engaged in any protected speech.  That aspect of their First Amendment claim must therefore be dismissed..

With respect to the free-association claim against O'Flynn, plaintiffs have alleged that O'Flynn made statements to Campanella to the effect that having Deborah work for Greene was going to put Campanella "in a box," due to Campanella's employment within the MCSO, and that it would "be a problem" for both plaintiffs if Greene ran for sheriff (as he in fact did) while Deborah was working for Leader.  Certainly those statements are subject to varying interpretations, and do not necessarily indicate retaliatory animus.  But on a motion to dismiss, it is not this Court's role to choose between competing interpretations of the facts alleged.  Instead, I must draw all reasonable inferences from those alleged facts in the plaintiffs' favor.  *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010).[4]

---

[4]Defendants do not appear to argue that the associational activity at issue here–Deborah's employment relationship with O'Flynn's prospective political opponent, Greene–did not relate to a matter of public concern, and I find that it did, insofar as Greene was expected to, and did, run for sheriff opposite O'Flynn.  *See Cobb*, 363 F.3d at 102 ("a public employee bringing a First Amendment freedom of association claim must persuade a court that the associational conduct at issue touches on a matter of public concern").  Certainly the election itself was a matter of public concern, and according to plaintiffs, the alleged "problem" posed by Deborah's employment at Greene stemmed directly from the fact that Greene was O'Flynn's opponent in that election.

I also note that the Supreme Court's recent decision in *Thompson v. North American Stainless, LP*, ___ U.S. ___, 131 S.Ct. 863 (2011), in which the Court held that an employee had standing to sue his employer under Title VII based on the allegation that the employer had fired him in retaliation for his coworker-fiancée's filing of an EEOC charge against the employer, does not pose an impediment to plaintiffs' claims here.  Defendants do not appear to have argued in this case that either plaintiff lacks standing to sue on their First Amendment claims, *see* Def. Mem of Law (Dkt. #11-6) at 17 (stating that "a spouse's claim that adverse action was taken solely against that spouse in retaliation for conduct of the other spouse should be analyzed as a claimed violation of a First Amendment right of intimate association") (quoting *Adler v. Pataki*, 185 F.3d 35, 44 (2d Cir. 1999)), and I find that both plaintiffs do have standing to sue, based on their association with each other and with Greene and Leader, and based on defendants' alleged adverse actions against Charles Campanella.

- 13 -

Construing the complaint according to that standard, O'Flynn's statements could reasonably be construed as a veiled threat, to the effect that if Deborah continued working for Leader (and, by extension, for O'Flynn's prospective opponent, Greene), that would create a "problem" for plaintiffs, and specifically for Campanella at work.  Those statements could reasonably be interpreted, then, as some evidence of retaliatory animus on O'Flynn's part.  *See Frobose*, 152 F.3d at 615 (bank president's letter, chastising plaintiff loan officer for pressing investigation of suspicious undocumented loan, and warning plaintiff, "You fully understand the basis from which future management decisions will be made," could reasonably "be construed as an official and not-so-veiled threat of retaliation"); *see also Wallace v. Suffolk County Police Dept.*, 396 F.Supp.2d 251, 265 (E.D.N.Y. 2005) (denying individual defendants' motion to dismiss § 1983 claims, based in part on allegations that defendants had warned plaintiff that police department would not "take kindly" to negative comments, and that plaintiff would "lament it for a lifetime" if he went public with his allegations about police misconduct).

Defendants contend that the complaint fails to allege O'Flynn's personal involvement in the alleged retaliation, but it is important to recognize that plaintiffs allege that O'Flynn made his statements in the course of a meeting with Campanella, the purpose of which was to discuss Campanella's concerns about actions taken toward him that he believed to be retaliatory.  Viewed in that light, O'Flynn's statements could be interpreted to mean, in effect, that yes, those acts had been retaliatory, but that they were justified and understandable, given Deborah's association with Greene and Leader.  That would suggest that O'Flynn was aware of, but sanctioned or acquiesced in, if not directed, the retaliation against plaintiff.  *See Queer v. Westmoreland County*, 296 Fed.Appx. 290, 295 (3d Cir. 2008) ("Personal involvement can be shown when a supervisor either personally directs the retaliatory action or has actual knowledge of, and acquiesces in, the retaliatory action"); *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) ("what we have meant by using phrases such as 'direct participation' as a basis of liability is personal participation by one who has knowledge of the facts that rendered the conduct illegal").

- 14 -

With respect to defendant Scott, defendants do not appear to contend that plaintiffs have failed to allege Scott's personal involvement in the alleged constitutional violations. Instead, they argue that the complaint fails to allege facts showing that Scott was motivated by retaliatory animus. Viewing the complaint in the light most favorable to plaintiffs, however, I disagree with that assertion. A recapitulation of the allegations concerning Scott will help to show why.

The complaint alleges that about three months after Deborah started working at Leader, Scott began what developed into a pattern of frequent reassignments of Campanella, contrary to MCSO's past practice, pursuant to which deputies generally would not be involuntarily reassigned except for disciplinary reasons. Scott also removed Campanella from the Operation Safe Child program, which caused Campanella to suffer a loss in earnings. Scott's actions were largely what prompted Campanella to seek the meeting with O'Flynn, at which O'Flynn allegedly made the "problem" statements.

Scott is also alleged to have conducted the investigation into the "gossiping" and related charges against Campanella, which eventually led to the issuance of the MOR. Plaintiffs allege that Scott failed to follow proper procedures during that investigation, for example by bypassing the Internal Affairs unit and by refusing to allow Campanella or Investigator Michael Witthuhn (whom Scott questioned at length concerning Campanella's alleged statements concerning Robutrad) to be accompanied by a union representative during Scott's questioning of them.

While plaintiffs must allege facts making it plausible to infer that Scott acted for retaliatory reasons, on a motion to dismiss, the Court should take into consideration the "full factual picture presented by the complaint," *L-7 Designs*, 647 F.3d at 430, including the timing of the events here. *See Ridner v. Salisbury Behavioral Health, Inc.*, No. 3:11–CV–572, 2011 WL 5089806, at *5 (M.D.Pa. Sept. 28, 2011) ("If 'the timing of the alleged retaliatory action is unusually suggestive of retaliatory motive a causal link will be inferred'") (quoting *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997)) (additional internal quotation marks omitted). Here, the "full picture" could reasonably be seen as evidencing Scott's animus.

The first alleged retaliatory act by Scott–an attempt to reassign Campanella–occurred in September 2008, about three months after Deborah started working for Leader.  In some situations, a gap of several months between protected activity and adverse action might negate any inference of causation.  *See, e.g., Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85–86 (2d Cir. 1990)(three and a half months insufficient); *McDowell v. N. Shore-Long Island Jewish Health Sys.*, 788 F.Supp.2d 78, 82 (E.D.N.Y. 2011) ("the Court finds that [a] greater than three month gap, unsupported by any other allegations showing plausible retaliation, is insufficient to raise an inference of retaliation"); *Meggison v. Paychex, Inc.*, 679 F.Supp.2d 379, 388 (W.D.N.Y. 2010)(period of four months insufficient).

But the "full factual picture" here involves not simply a single instance of protected activity, followed some months later by an isolated alleged act of retaliation.  Deborah's employment with Leader was not a one-time event, but an ongoing circumstance.  More to the point, what made that employment a "problem" was the upcoming election for Monroe County sheriff, which would not be held until November 2009.  As that date, and the campaign season leading up to it, got closer, it would not have been surprising if defendants began to perceive Deborah's association with Leader and Greene as an increasingly bigger "problem" that needed to be dealt with.  Given Scott's position as chief deputy, it is also not implausible to think that he was acting in response to O'Flynn's actual or perceived wishes concerning this matter.

The allegations concerning Tomassetti must be considered in the same light.  He authored the MOR charging Campanella with certain violations, and he allegedly attempted to falsify the record with respect to that MOR, to make it appear that proper procedures had been followed regarding whether Campanella had been given or offered counseling prior to the issuance of the MOR.  Although the MOR was not issued until May 2009, that again must be viewed against the backdrop of the upcoming November election, which suggests a reason why defendants might have sought to ramp up the pressure on plaintiffs to disassociate themselves from Leader and Greene.  Whether plaintiffs will be able to prove such allegations following discovery remains to be seen, but

viewing the factual allegations in the light most favorable to plaintiffs, I conclude that they have stated a facially valid claim against Tomassetti.

With respect to Caiola, plaintiffs alleges that Campanella was told that Caiola had made statements to others about his concerns over the connection between Campanella and Leader, and that Caiola was monitoring Leader's website and had boasted that Leader, and everyone connected with it, were going to "go down." Although, as pleaded, these allegations are based on hearsay, that does not bar the Court from considering them on a motion to dismiss. Neither *Twombly* nor *Iqbal* altered the rule that a plaintiff need not plead specific, admissible evidence in support of a claim, and a contrary rule would confuse the principles applicable to a motion to dismiss with those governing a motion for summary judgment. *See Luxpro Corp. v. Apple Inc.*, 2011 WL 3566616, at *3 (N.D.Cal. Aug. 12, 2011) (rejecting defendant's argument that court could not consider hearsay allegations on a motion to dismiss); *Polar Molecular Corp. v. Amway Corp.*, No. 07–460, 2007 WL 3473112 at *4 (W.D.Mich. Nov. 14, 2007) ("Whether the allegations in the complaint are based on hearsay is not relevant to a motion under Rule 12(b)(6) or 12(c)"); *see also Briggs v. Women in Need, Inc.*, ___ F.Supp.2d ___, 2011 WL 3794157, at *3 (E.D.N.Y. Aug. 24, 2011) ("*Twombly* 'affirmed the vitality of *Swierkiewicz*[ *v. Sorema*, 534 U.S. 506 (2002)], which applied a notice pleading standard, and explained that its decision did not 'require heightened fact pleading of specifics'") (quoting *Boykin v. Key Corp.*, 521 F.3d 202, 213 (2d Cir. 2008)).

In addition, because *Twombly*'s "plausibility standard ... does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant, ... or where the belief is based on factual information that makes the inference of culpability plausible," *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (internal quotation marks omitted), to hold that hearsay-based allegations cannot be considered on a motion to dismiss would lead to the absurd result that a plaintiff could effectively be punished for pleading too much, in the sense that a complaint pleading unattributed facts could survive a motion to dismiss, while one that pleads the same facts, but admittedly bases them on

hearsay, could not. Although the lower courts continue to work out the practical application of the *Twombly*/*Iqbal* standard, *see McCauley*, ___ F.3d at ___, 2011 WL 4975644, at *10 (stating that "the lower federal court decisions seeking to apply the new 'plausibility' standard are wildly inconsistent with each other") (Hamilton, C.J., dissenting in part), surely that standard should not be interpreted in a way that encourages *less* detailed pleading.

Caiola's alleged statements are evidence of some animus on his part with respect to Deborah's employment at Leader. Caiola allegedly asked what Campanella was "doing with Greene," and whether this meant that there would be "trouble with this Campanella kid." He also allegedly vowed that Leader, and everyone affiliated with it, were going to "go down."

As with O'Flynn, defendants argue that there are no factual allegations showing that Caiola had any personal involvement in the alleged retaliatory acts. According to defendants, then, plaintiffs have alleged nothing more than statements by Caiola to third parties, and those statements alone do not amount to retaliatory acts.

If this action had been brought only against Caiola, based only on his alleged statements, that argument might be well taken. But again, looking at the entire picture painted by the allegations of the complaint, it seems at least plausible that Caiola–the undersheriff for Monroe County–would have played a part in orchestrating the alleged campaign of retaliation against Campanella, to punish him, or put pressure on him (and through him, on Deborah), because of Deborah's employment with Leader.

None of this is meant to suggest that the Court believes that plaintiffs have a *valid* claim against defendants which they will be able to establish at trial. That issue is not now before me. The question is whether they have stated a facially *viable* claim, meaning one that, assuming the truth of their factual allegations, presents a plausible (not necessarily *probable*) claim. I find that plaintiffs have done so. *See Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 324 (2d Cir. 2011) ("[a]sking for plausible grounds ... does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of actionable

conduct) (quoting *Twombly*, 550 U.S. at 556) (alteration in original), *petition for cert. filed*, 80 U.S.L.W. 3339 (Nov. 23, 2011).

As stated, there are two components to plaintiff's free-speech claim.  Plaintiffs allege that they were retaliated against because of Campanella's statements to Deborah about the DiPonzio matter, and because of his statements to Investigator Witthuhn about the Robutrad investigation.

Even accepting the truth of plaintiffs' factual allegations, those allegations do not show that the statements concerning Court Deputy DiPonzio related to a matter of public concern.  Those statements, therefore, were not protected by the First Amendment, and there is no basis for a retaliation claim predicated upon those statements.

The Second Circuit recently summarized the general principles concerning the protected-speech element of a First Amendment retaliation claim as follows:

> for speech to be protected by the First Amendment, it must be "on a matter of public concern," which includes speech "relating to any matter of political, social, or other concern to the community."  *Connick*[ *v. Myers*, 461 U.S. 138, 146 (1983)].  In contrast, when a public employee "speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest," courts should not "review the wisdom of a personnel decision taken" in response.  *Id.* at 147.  ... To determine "[w]hether an employee's speech addresses a matter of public concern," courts look to "the content, form, and context of a given statement, as revealed by the whole record."  *Id.* at 147-48.

*Nagle v. Marron*, 663 F.3d 100, 106 (2d Cir. 2011).  Whether something is a matter of public concern is a question of law for the court.  *See Connick*, 461 U.S. at 148 n. 7.

In general, an employee's statements concerning his employer's decisions and practices with respect to internal employment issues do not relate to matters of public concern.  *See, e.g., Dixon v. Kirkpatrick*, 553 F.3d 1294, 1304 (10th Cir. 2009); *Sullivan v. Ramirez*, 360 F.3d 692, 699 (7th Cir. 2004); *Shanahan v. New York*, No. 10 Civ 0742, 2011 WL 223202, at *9 (S.D.N.Y. Jan. 24, 2011).  I see no reason to depart from that general principle here.  Although the shooting of Officer DiPonzio (*i.e.*, the son of Campanella's coworker, Court Deputy DiPonzio) was certainly of great public concern in the Rochester area, the tangential matter concerning the MCSO's grant or denial of Court Deputy DiPonzio's request for time off in the wake of that event was strictly an internal personnel

matter of no importance to the public at large.  *See Phares v. Gustafsson*, 856 F.2d 1003, 1009 (7th Cir. 1988) (dispute over vacation time not a matter of public concern); *McMillion v. Metropolitan Gov't of Nashville and Davidson County*, 799 F.Supp.2d 821, 827 (M.D.Tenn 2011) (employee's speech concerning accrual of her leave time did not relate to matter of public concern).

As to the Robutrad matter, Tomassetti stated in the MOR that he and Campanella had "discussed a conversation [Campanella] had with Investigator Mike Witthuhn.  During the course of that conversation [Campanella] stated, in sum and substance, that two MCSO investigators were being investigated by the FBI for conducting an improper investigation" and that "the investigators may be charged criminally for their actions."  Plaintiffs' Cross-Motion (Dkt. #17) Ex. B.  Tomassetti stated that Campanella's alleged statement about this matter was untrue, and that Campanella had "repeated malicious rumors and/or idle conversation which were derogatory to the department," thereby "bring[ing] the department into disrepute and reflect[ing] discredit upon [him]self."  *Id.*

Although Tomassetti also stated that Campanella "denied having this conversation with Investigator Witthuhn," Campanella did state in his own "special report" to Tomassetti, in response to the MOR, that he "did discuss a newspaper article that appeared in the Democrat and Chronicle with Investigator Witthuhn, about the FBI police corruption unit being involved in the Robutrad investigation with the MCSO."  Campanella added that "[t]his [wa]s not gossip or a rumor, as it was confirmed by the MCSO in the same article," which was widely discussed among MCSO employees.  Plaintiff's Cross-Motion Ex. C.

In their primary brief in support of their motion to dismiss (Dkt. #11-6), defendants state, with virtually no analysis, that none of Campanella's statements addressed a matter of public concern, but dealt only "with his individual employment situation ... ." Def. Mem. 16.  It is certainly difficult to see, however, how a discussion about the Robutrad investigation dealt only with

Campanella's employment, since he does not appear to have been implicated or involved in the Robutrad investigation.[5]

For that matter, it is difficult to see how a scandal involving allegations of the misuse of county funds, favoritism in the awarding of county contracts, and possible charges against MCSO investigators stemming from the FBI's investigation into that scandal, could not be considered a matter of public interest. Although it is not clear from the pleadings exactly what Campanella is alleged to have said about this matter, there is no indication that his comments related solely to some purely ancillary aspect, akin to his statements about the handling of Court Deputy DiPonzio's leave request, or some purely personal matter.

Although the context in which Campanella's statements were made is a relevant consideration, the fact that they may have been made in private to a coworker is not dispositive of whether they related to a matter of public concern, nor is it enough simply to characterize those statements as "gossip," since Campanella's subjective motivation in making those statements is likewise not determinative of whether the statements were protected. *See Rankin v. McPherson*, 483 U.S. 378, 386 (1987) ("The private nature of the [plaintiff's] statement does not ... vitiate the status of the statement as addressing a matter of public concern"); *Nagle v. Marron*, 663 F.3d 100, 107 (2d Cir. 2011) ("the primary question for First Amendment purposes is whether the matter is of public concern, not whether the speech was also made to serve some private interest"); *Reuland v. Hynes*, 460 F.3d 409, 417-18 (2d Cir. 2006) (although the speaker's motive may be relevant, it "is not dispositive as to whether an employee's speech relates to a matter of public concern"), *cert. denied*, 552 U.S. 819 (2007); *Perfetto v. Erie County Water Auth.*, No. 03-CV-439, 2006 WL 1888556, at *12 (W.D.N.Y. July 7, 2006) ("The fact that Perfetto made the statements in the context of private

---

[5]For that matter, Campanella's statements about DiPonzio did not relate to *his* employment. They did not relate to a matter of public concern, and hence cannot form the basis for a First Amendment claim, but it is not accurate to say that they "generally related to [Campanella's] own situation" or a "personal grievance." Def. Mem. at 16.

conversations with others at the ECWA is not relevant to whether the *content* relates to matters of public concern").

In their reply brief, defendants also contend that even if Campanella's speech about Robutrad involved a matter of public concern, it was sufficiently disruptive, or potentially disruptive, of the operation of the MCSO as to justify defendants in taking action against him on account of that speech. This argument relates to the so-called *Pickering* balancing test. *See Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968).

> Under this defense, "[a] government employer may take an adverse employment action against a public employee for speech on matters of public concern if: (1) the employer's prediction of the disruption that such speech will cause is reasonable; (2) the potential for disruption outweighs the value of the speech; and (3) the employer took the adverse employment action not in retaliation for the employee's speech, but because of the potential for disruption."

*Anemone v. Metropolitan Transp. Auth.*, 629 F.3d 97, 115 (2d Cir. 2011) (quoting *Johnson v. Ganim*, 342 F.3d 105, 114 (2d Cir. 2003)).

In the case at bar, it is in dispute what Campanella said about the Robutrad matter; his account in his "Special Report" took issue with Tomassetti's version in the MOR. Regardless, though, whether defendants' issuance of the MOR was justified based upon the potential for disruption caused by Campanella's speech cannot be resolved on a motion to dismiss. *See Massena v. Bronstein*, No. 10-CV-1245, 2011 WL 754112, at *3 (N.D.N.Y. Feb. 24, 2011) (whether plaintiff's conduct was sufficiently disruptive to justify his suspension was a factual issue that could not be resolved on a motion to dismiss); *Cook v. McIntosh*, No. 97CV773, 1998 WL 91066, at *4 (D.Conn. Feb. 20, 1998) (on a motion to dismiss, court could not draw inferences that the disruptive nature of plaintiff's speech justified her termination, and that defendants fired her because of that disruption and not in retaliation for the speech itself).[6]

---

[6]I note that defendants do not appear to contend that the issuance of the MOR, which found that Campanella had committed certain violations of the general orders of the MCSO, was insufficiently adverse to give rise to a First Amendment claim. While I express no opinion on that question, there is authority that letters of reprimand and the like can constitute adverse

(continued...)

To the extent that the seventh cause of action seeks attorney's fees under § 1988, predicated on plaintiffs' First Amendment claim, I also deny defendants' motion to dismiss that cause of action. Since the First Amendment claim is sufficient to withstand defendants' Rule 12(c) motion, whether plaintiffs will be entitled to fees under § 1988 cannot, of course, be determined at this time.

## III. Due Process

Plaintiffs' second cause of action asserts a claim by Charles Campanella against all the defendants for a denial of his due process rights. Plaintiffs allege that defendants committed this violation of Campanella's rights "[b]y arbitrarily and capriciously accusing Plaintiff of wholly false allegations of wrongdoing ... in that they deprived Plaintiff Deputy Campanella of his property interest in his employment as an MCSO Deputy without due process of law ... ." Complaint ¶ 50.

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents v. Roth*, 408 U.S. 564, 569 (1972). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it [or a] unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* at 577; *accord Johnson v. Rowley*, 569 F.3d 40, 44 (2d Cir. 2009). Such interests arise not from the Constitution itself, but rather "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Id.*; *accord Rolon v. Henneman*, 517 F.3d 140, 148 (2d Cir. 2008).

Plaintiffs have failed to identify any protected property interest, or the source of any such alleged interest, that was implicated by defendants' actions in this case. Plaintiffs' response to

---

[6](...continued)
actions for purposes of a retaliation claim, particularly when they are made a permanent part of the employee's personnel file. *See, e.g., Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 226 (2d Cir. 2006) ("[a]dverse employment actions include ... reprimand," and may include "lesser actions," such as "negative evaluation letters [or] express accusations of lying") (internal quotation marks and citations omitted), *cert. denied*, 549 U.S. 1342 (2007); *Aquavia v. Goggin*, 208 F.Supp.2d 225, 233 (D.Conn. 2002) ("formal reprimands ... can satisfy the requirement of an adverse employment action in the First Amendment retaliation context").

defendants' motion focuses on alleged procedural improprieties in the course of defendants' investigation into plaintiffs' statements, and the issuance of the MOR, but that is putting the proverbial cart before the horse.  There is no need to reach the question of whether defendants followed proper procedures until plaintiffs have established that Campanella had some protected interest at stake.  Plaintiffs have failed to establish that interest.

All that plaintiffs have alleged is that Campanella's shifts and assignments were changed, and that he lost some income as a result of being removed from the Operation Safe Child program.  That Campanella may have disliked, or felt aggrieved by those actions, however, is not enough to show that he had a legitimate claim of entitlement in that regard.  He has not identified any contractual or other source that would support a finding that he had any such claim of entitlement.  *See MacFall v. City of Rochester*, 746 F.Supp.2d 474, 482 (W.D.N.Y. 2010) ("As a general principle, there is no constitutional right to overtime pay or similar benefits"); *see Storman v. Klein*, No. 09 Civ. 0338, 2009 WL 1035964, at \*12 (S.D.N.Y. Apr. 20, 2009) ("[C]ourts in this Circuit have found that 'disputes over overtime, over work assignments, over lunch and coffee breaks do not implicate the great objects of the Fourteenth Amendment'"); *Roche v. O'Meara*, 175 F.Supp.2d 276, 283 (D.Conn. 2001) ("the plaintiff did not have a property interest in the scheduling of her work shifts") (citing *Ezekwo v. NYC Health & Hosp. Corp.*, 940 F.2d 775, 782 (2d Cir. 1991)).

Furthermore, Campanella was afforded process, in the form of a grievance proceeding and arbitration hearing.  Plaintiffs have not identified any constitutionally significant defects or shortcomings in those proceedings, so for this additional reason, plaintiffs' procedural due process claim fails.  *See DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003) ("Generally, due process requires that a state afford persons 'some kind of hearing' prior to depriving them of a liberty or property interest") (quoting *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 299 (1981)), *cert. denied*, 541 U.S. 988 (2004); *Bullock v. Gerould*, 338 F.Supp.2d 446, 452 (W.D.N.Y. 2004) (plaintiff's due process claim failed where he went through arbitration proceeding,

- 24 -

in which he was "given a full opportunity to present evidence, testimony and argument and to examine and cross-examine witnesses who were sworn").

In opposition to defendants' motion, plaintiffs also argue that they have stated a claim for a denial of substantive due process, "as a result of the stigma associated with the defamation [of Campanella] as a result of his reassignments and disciplinary actions taken against him." Plaintiffs' Mem. (Dkt. #16) at 13. I disagree.

"To establish a violation of substantive due process rights, a plaintiff must demonstrate that the state action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Okin v. Village of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 431 (2d Cir. 2009) (internal quotation marks omitted). Plaintiffs have failed to allege such action by defendants.

In addition, while it is possible to state a due process claim on a "stigma plus" theory, such a claim requires plausible allegations of: (1) a defamatory statement; (2) "some tangible and material state-imposed burden in addition to the stigmatizing statement"; and (3) a lack of process adequate to justify the state's action. *Velez v. Levy*, 401 F.3d 75, 87–88 (2d Cir. 2005) (internal quotation marks and ellipsis omitted). To allege a defamatory statement, a plaintiff must allege a public statement injurious to the plaintiff that is capable of being proven false and that was false. *Id.* at 87.[7]

As explained above, plaintiffs have failed to allege a defamatory statement in this case. Moreover, the facts alleged do not plausibly show any "stigma plus." Even assuming that the findings contained in the MOR could be found to have "call[ed] into question plaintiff's 'good name, reputation, honor, or integrity,'" *Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004) (quoting *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 446 (2d Cir. 1980)), there are no allegations indicating that Campanella was thereby deprived of some tangible interest, such

---

[7]While plaintiffs' brief discusses their stigma-plus theory in the context of their substantive due process claim, I note that "stigma plus is a species within the phylum of procedural due process claims ... ." *Segal v. City of New York*, 459 F.3d 207, 213 (2d Cir. 2006).

as his government employment.  *See Patterson*, 370 F.3d at 329-30; *Jay Jian-Qing Wang v. Swain*, No. 09-CV-306, 2011 WL 887815, at *11 (N.D.N.Y. Mar. 14, 2011).

## IV. Negligent Hiring, Training and Supervision

Plaintiffs' failure to plead any facially sufficient claim other than a First Amendment retaliation claim defeats any claim of theirs that the County's and MCSO's negligence in hiring, training, supervising or retaining any individual defendant (collectively, "failure to train") was a proximate cause of the alleged violations of plaintiffs' rights in those respects.

As to the one claim that does remain, the retaliation claim, plaintiffs' failure-to-train allegations do no more than recite the elements of the claim, in formulaic fashion, and even those allegations do not support the failure-to-train claim as to the First Amendment matter.  Plaintiffs allege, upon information and belief, that the County and MCSO have failed to train and supervise officers "in the proper handling of personnel complaints regarding wrongdoing, corruption and or illegal activities of other members of the MCSO personnel."  Complaint ¶ 69.

The alleged retaliation here concerned Deborah's employment at Leader, both plaintiffs' conversation about Court Deputy DiPonzio, and Campanella's statements to a coworker about Robutrad.  None of those involve "personnel *complaints* regarding wrongdoing, corruption and or illegal activities of other members of the MCSO personnel."  Simply appending conclusory assertions that the County and MCSO failed to train their employees is not enough to state a claim.  *See Beckford v. City of New Haven*, No. 11-cv-498 py, 2011 WL 6153182, at *6 (D.Conn.  Dec. 12, 2011) ("assuming arguendo that Plaintiff's Amended Complaint raises a claim of municipal liability on a theory of failure to train, absent any factual allegations whatsoever regarding a pattern of excessive force violations by the New Haven Police Department, Plaintiff has not plausibly alleged a claim upon which relief may be granted"); *Simms v. The City of New York*, No. 10-CV-3420, 2011 WL 4543051, at *2 n.3 (E.D.N.Y. Sept. 28, 2011) ("Since [*Twombly* and *Iqbal*], courts in this district have generally required that plaintiffs provide more than a simple recitation of their theory

of liability, even if that theory is based on a failure to train") (citing cases); *Newton v. City of New York*, 640 F.Supp.2d 426, 448 (S.D.N.Y. 2009) ("[P]assive failure to train claims pursuant to section 1983 have not survived the Supreme Court's recent decision in *Ashcroft v. Iqbal*").

Again, the Court recognizes that plaintiffs need not plead detailed evidence, but simply appending the conclusory allegation that defendants have been negligent in regard to their hiring and supervision of their employees is not enough to make such a claim plausible, particularly where the alleged negligence does not appear to relate directly to the underlying constitutional claims. As the Supreme Court has recently reiterated, "[i]n virtually every instance where a person has had his or her constitutional rights violated by a [municipal] employee, a § 1983 plaintiff will be able to point to something the [municipality] 'could have done' to prevent the unfortunate incident." *Connick v. Thompson*, ___ U.S. ___, 131 S.Ct. 1350, 1363 (2011) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 392 (1989)). In evaluating failure-to-train claims, therefore, courts "must adhere to a 'stringent standard of fault,' lest municipal liability under § 1983 collapse into *respondeat superior*,'" *Connick*, ___ U.S. at ___, 131 S.Ct. at 1365 (quoting *Board of County Commrs. of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 406, 410 (1997)), and plaintiffs must "show that it was so predictable that failing to train the [municipal employees] amounted to *conscious disregard* for [plaintiffs'] rights." *Connick*, ___ U.S. at ___, 131 S.Ct. at 1365. Plaintiffs in the case at bar have not alleged facts that would support such a finding.

I also see no other basis for liability on the part of the County or the MCSO. Where a Section 1983 claim is alleged against a county on the grounds of unconstitutional acts by its employees, a plaintiff must demonstrate that his injuries resulted from a county policy, custom, or practice. *See Monell v. Department of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Robinson v. County of Yates*, ___ F.Supp.2d ___, 2011 WL 4439474, at *4 (W.D.N.Y. Sept. 23, 2011). Other than the conclusory failure-to-train allegations, plaintiffs' complaint does not identify or describe any County policy, custom or practice that gave rise to the alleged First Amendment violation. All of plaintiffs' claims

against the County and the MCSO must therefore be dismissed.  *See Zembiec v. County of Monroe*, 766 F.Supp.2d 484, 498 (W.D.N.Y. 2011).

## V. Plaintiffs' Cross-Motion for Attorney's Fees

In response to defendants' Rule 12(c) motion, plaintiffs have cross-moved for an award of attorney's fees under 28 U.S.C. § 1927, which provides that an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

Plaintiffs' motion is denied.  As explained above, in many respects I have found that defendants' motion has merit.  Even as to the portions that the Court has denied, the motion cannot fairly be characterized as having "unreasonably and vexatiously" multiplied the proceedings in this case.  Attorney's fees under § 1927 should be reserved for truly unreasonable behavior, not granted–or sought–as a matter of course.  *See United States v. Shaygan*, 652 F.3d 1297, 1314 (11th Cir. 2011) (court can sanction attorney for "unreasonably and vexatiously" multiplying a proceeding "only when the attorney's conduct is so egregious that it is tantamount to bad faith") (internal quotation marks and citation omitted); *Grider v. Keystone Health Plan Central, Inc.*, 580 F.3d 119, 142 (3d Cir. 2009) ("sanctions may not be imposed under § 1927 absent a finding that counsel's conduct resulted from bad faith, rather than misunderstanding, bad judgment, or well-intentioned zeal," and therefore the "attorney's conduct must be of an egregious nature, stamped by bad faith that is violative of recognized standards in the conduct of litigation") (internal quotation marks omitted).  To routinely move for such fees every time one is faced with a dispositive motion runs the risk of engendering the needless multiplication of proceedings that the statute is designed to deter.

## CONCLUSION

Defendants' motion for judgment on the pleadings (Dkt. #11) is granted in part and denied in part.   Plaintiffs' second, third, fourth, fifth and sixth causes of action are dismissed.   All of plaintiffs' claims against Monroe County and the Monroe County Sheriff's Office are also dismissed. Plaintiffs' first cause of action is dismissed to the extent that it asserts a First Amendment claim based upon plaintiffs' conversations concerning Court Deputy DiPonzio.   In all other respects, defendants' motion is denied.

Plaintiffs' cross-motion for attorney's fees (Dkt. #17) is denied.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
        February 17, 2012.