UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CHARLES E. CAMPANELLA, II,
DEBORAH S. CAMPANELLA,

                              Plaintiffs,

                                                    Case # 10-CV-6236-FPG

v.

                                                    DECISION AND ORDER

MONROE COUNTY SHERIFF PATRICK M. O'FLYNN,
MONROE COUNTY UNDERSHERIFF GARY CAIOLA,
CHIEF DEPUTY STEVEN SCOTT,
LIEUTENANT LOU TOMASSETTI, and other known
or unknown members of the Monroe County
Sheriff's Office, individually and in their
official capacities,[1]

                              Defendants.

# INTRODUCTION

On April 29, 2010, Plaintiffs Charles ("Deputy Campanella") and Deborah Campanella

("Ms. Campanella") (collectively "Plaintiffs") brought this action under 42 U.S.C. § 1983

against Defendants Monroe County, the Monroe County Sheriff's Office ("MCSO"), and MCSO

employees Patrick M. O'Flynn ("Sheriff O'Flynn"), Gary Caiola ("Undersheriff Caiola"), Steven

Scott ("Deputy Scott"), and Lucio Tomassetti ("Lieutenant Tomassetti") (collectively

"Defendants"). ECF No. 1. Plaintiffs alleged that Defendants took adverse employment actions

against Deputy Campanella in violation of Plaintiffs' constitutional rights. *Id.* In broad strokes,

Plaintiffs allege that Defendants investigated, threatened, reprimanded, reassigned, and refused

to promote Deputy Campanella in response to Deputy Campanella's statements about a local

scandal and Ms. Campanella's association with a political rival. *Id.*

---

[1]     Plaintiffs originally named the County of Monroe and the Monroe County Sheriff's Office in this suit, but the Court dismissed the claims against those defendants. ECF No. 24.

Initially, Plaintiffs' Complaint alleged multiple First Amendment and Due Process violations as well as libel, slander, defamation, and negligent failure to train and supervise. *Id.* However, in resolving Defendants' motion for judgment on the pleadings, ECF No. 11, Judge Larimer, presiding over this case at that time, dismissed all but two of Plaintiffs' First Amendment claims. ECF No. 24. Additionally, Judge Larimer dismissed all of Plaintiffs' claims against Monroe County and the MCSO. *Id.* The case was then transferred to this Court. ECF No. 33. Plaintiffs' surviving claims allege that Sheriff O'Flynn, Undersheriff Caiola, Deputy Scott, and Lieutenant Tomassetti took seven adverse employment actions against Deputy Campanella in retaliation for two things: Deputy Campanella's statement about the investigation of a local construction firm and Ms. Campanella's affiliation with a man who ran as the Democratic candidate for Monroe County Sheriff in 2009. *Id.*

On July 19, 2016, Defendants moved for summary judgment. ECF No. 60. Although Plaintiffs' Response was due by August 16, 2016, *see* L.R. CIV. PRO. 7(b)(2)(A), Plaintiffs have not responded to that motion or requested an extension. For the reasons stated below, Defendants' motion is GRANTED and this case is DISMISSED.

## DISCUSSION

### I.    Summary Judgment Standard

A motion for summary judgment should be granted where the moving party shows that "there is no genuine dispute as to any material fact" and that the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute regarding such a fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Thus, when presented with a motion for summary judgment, the Court must determine "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

The burden of establishing that no genuine and material factual dispute exists is on the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). To that end, the Court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003). That said, if the non-moving party fails to respond to their opponent's motion for summary judgment, "the court may consider as undisputed the facts set forth in the moving party's affidavits." *Gittens v. Garlocks Sealing Technologies*, 19 F. Supp. 2d 104, 109 (W.D.N.Y. 1998). Once the Court is satisfied that the moving party's assertions are supported by citations to evidence in the record, and those assertions show that the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

## II.     Material Facts

In compliance with Rule 56(b) of the Local Rules of Civil Procedure for the Western District of New York, Defendants filed a Statement of Material Undisputed Facts with their Motion for Summary Judgment. ECF No. 60-2. Plaintiffs have not filed an opposing statement. For that reason, the Court considers Defendants' Rule 56 Statement undisputed. *See* L. R. Civ. P. 56(a)(2) ("Each numbered paragraph in the moving party's statement of material facts may be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement."). That undisputed statement and the exhibits attached in support establish the following.

### a.  The Parties

Charles Campanella worked for the MCSO from 1988 to 2012. ECF No. 60-2, ¶2, 8. During the relevant periods of Deputy Campanella's employment with the MCSO, Patrick O'Flynn was the Monroe County Sheriff. *Id.* at ¶9. Sheriff O'Flynn was first elected in 2001, ECF No. 60-4, 11:2-4, and was reelected in 2005, 2009, and 2013. *Id.* at 11:18-20. In each election, Sheriff O'Flynn ran as the Republican Party's candidate. *Id.* 72:23-25. Under Sheriff O'Flynn, and at all times relevant to the issues in this case, Gary Caiola was the Undersheriff. ECF No. 60-2, ¶10. Steven Scott was the Chief Deputy. *Id.* at ¶11. Lucio Tomassetti was the Special Operations Commander. *Id.* at ¶27.

Ms. Campanella is a real estate broker and insurance producer. ECF No. 60-6, 6-7. She is also active in local government. ECF No. 60-6, 18:3. In 2008, Ms. Campanella won the Republican Party's endorsement for a town council seat for the Town of Riga. *Id.* at 50:7-9; ECF No. 60-2, ¶16. In 2009, she won in the general election. *Id.* She ran in the 2009 general election on the same ticket as Sheriff O'Flynn. ECF No. 60-6, 50:7-9.

In 2008, Ms. Campanella began working as a part-time business manager for Leader Security Services ("Leader"). ECF No. 60-2, ¶17. Leader was founded by Daniel Greene. *Id.* at ¶14. Before founding Leader, Greene worked for the MCSO as an undersheriff under Sheriff O'Flynn. *Id.* at ¶9, 13. On May 9, 2009, Greene announced that he was running for Sheriff, as the Democratic Candidate, against O'Flynn. *Id.* at ¶15. Ms. Campanella worked for Leader until December 2012. ECF No. 60-6, 21:10-12.

### b. Deputy Campanella's Employment at the MCSO

Deputy Campanella began working as a deputy sheriff for the MCSO in 1988. ECF No. 60-2, ¶1. He retired from that position on June 23, 2012. *Id.* at ¶8. During his 24 years at the MCSO, Deputy Campanella's duties and assignments varied. *Id.* at ¶3-7. From 1988 until 1990, Deputy Campanella worked as a part-time Deputy Sheriff. ECF No. 60-3. In 1990, Deputy

Campanella became a full-time, Road Patrol Deputy.  *Id.*   Approximately two or three years later, Deputy Campanella was assigned to his first special assignment, the DARE program.  *Id.* After three or four years in the DARE Program, Deputy Campanella was assigned to the Warrant Unit.  *Id.*   After spending three or four years in the Warrant Unit, Deputy Campanella was assigned to the Narcotics Unit.  *Id.*  In 2005, Deputy Campanella was assigned to the Community Services Unit as a Crime Prevention Officer ("CPO").  *Id.*; s*ee also* ECF No. 60-2, ¶34, 41.  He served as a CPO until 2009.   ECF Nos. 60-2, ¶41; 60-3.   On January 25, 2010, Deputy Campanella was reassigned to Road Patrol.  ECF No. 60-2, ¶44.

While carrying out his road patrol and special assignment duties, Deputy Campanella also performed other duties for the MCSO.  ECF No. 60-3.  Deputy Campanella was a member of the SWAT team for 14 years, between 1994 and 2008, and a SWAT Team Leader for four years, from 2008 until his retirement.  *Id.*; *see also* ECF No. 60-2, ¶3-6.   Deputy Campanella took on additional road patrol duties.  ECF No. 60-3, 99:4-8.  Deputy Campanella was a firearms instructor during Police Academy classes.  ECF No. 60-2, ¶7.  Lastly, Deputy Campanella's duties as a member of the Community Services Unit involved leading a range of community programs.  *Id.* at ¶91-93.   Those programs included Senior Citizens Academy, Fatal Crash Simulations, firearms and alcohol safety talks, Neighborhood Watch meetings, and Operation Safe Child.  *Id*. at ¶93; *see also* ECF No. 60-3.  The Operation Safe Child program involves operating a machine that creates identification cards for children.  ECF No. 60-2, ¶91.

As a CPO, Deputy Campanella's standard hours were Monday through Friday, from 8 a.m. to 4 p.m.  ECF No. 60-3, 41:10.   But taking on additional duties and participating in community programs often required him to work evenings and weekends.  *Id.* at 35:12-20 (Deputy Campanella led firearms safety talks in the evenings); *id.* at 41:16-22 (same for Neighborhood Watch); *id.* at 45:5-8 (SWAT operations often required Deputy Campanella to

work evenings and weekends); *id.* at 99:4-8 (same for road patrol shifts); *id.* at 123:20-23 (Deputy Campanella operated the Operation Safe Child machine on the weekends).   When Deputy Campanella worked in the evening or over the weekend, he received overtime pay.  *Id.* at 41:19-22.

### c.  Deputy Campanella's Employment at the MCSO from 2008 to 2012

In 2008, the MCSO began to limit the amount of time a deputy could remain assigned to a specialized unit.  *Id.* at ¶37.  To that end, the MCSO reassigned deputies in at least some specialized units.  *Id.* at ¶42.  That included Deputy Campanella and the deputies in the Community Services Unit.  *Id.* at ¶¶34-35.  On September 23, 2008, Deputy Scott announced that the MCSO would be reposting the CPO positions and reassigning the CPOs.  *Id.* at ¶38.  At the time of Deputy Scott's announcement, Deputy Campanella and two other deputies were CPOs. *Id.* at ¶31.  By January 25, 2010, all three CPOs were either reassigned to Road Patrol or retired. *Id.* at ¶¶44-46.

Between September 2008 and January 2010, after the CPO reassignments were announced but before the reassignments went into effect, Deputy Campanella's duties fluctuated. *Id.* at ¶42, 93.   Around July 2009, Deputy Campanella stopped operating the Operation Safe Child machine.  *Id.* at ¶93.  Additionally, between September 2009 and December 2009 Deputy Campanella was assigned to work temporarily as a fulltime Firearm Instructor.  ECF No. 60-2, ¶42.  Deputy Campanella was placed in that position as the MCSO transitioned from one type of firearm to another.  *Id.*

On June 12, 2009, the MCSO created a fulltime and permanent Firearms Deputy position in an attempt to reduce the amount of overtime that temporary and part-time instructors generated.  *Id.* at ¶98.  Deputy Campanella and six other officers applied for that position.  *Id.* at ¶101, 104.  All seven of those applications were presented to a selection committee.  *Id.* at ¶110.

Seven officers sat on that selection committee. *Id.* at ¶111-12, 120. Four of the seven officers on the selection committee recommended Deputy Brian Moore for the Firearms Deputy position. *Id.* at ¶120. On June 30, 2009, the position was awarded to Deputy Moore. *Id.* at ¶113. As noted above, on January 25, 2010, Deputy Campanella was reassigned to Road Patrol. ECF No. 60-2, ¶44. Deputy Campanella retired from the MCSO on June 23, 2012. *Id.* at ¶8.

### d. Deputy Campanella's Meeting with Sheriff O'Flynn

Shortly after the CPO reassignments were announced, Deputy Campanella requested to meet with Sheriff O'Flynn. *Id.* at ¶54. On October 20, 2008, Deputy Campanella and Sheriff O'Flynn met at a Starbucks. *Id.* at ¶55. At that meeting, Sheriff O'Flynn learned that Ms. Campanella worked for Dan Greene at Leader Security. ECF No. 60-2, ¶56. Knowing that Greene intended to run for Sheriff as a the Democratic nominee, ECF No. 60-4, 72:15-19, and that Ms. Campanella intended to run for Town Council as the Republican nominee, *id.* at 76:22-23, Sheriff O'Flynn told Deputy Campanella that Ms. Campanella's employment for Greene would put them in a compromising position. *Id.* at 80:17-24. Because Ms. Campanella would be running as a Republican on the same ticket as Sheriff O'Flynn, Sheriff O'Flynn was concerned about the conflict of interest that Ms. Campanella's employment for his opponent might present. *Id.*

### e. Investigation of Deputy Campanella for Gossiping

In the spring of 2009, MCSO officers investigated two allegations that Deputy Campanella was inappropriately gossiping. ECF No.60-2, ¶¶61-89. In April 2009, MCSO Major Crimes Investigators Patrick Crough and Kevin Garvey told Undersheriff Caiola that they heard Deputy Campanella spreading a rumor that MCSO officers might face criminal charges for conducting an improper investigation of the Robutrad matter. ECF No. 60-5, 123-24. Robutrad is a now-defunct local company that once did construction work for Monroe County. ECF No.

60-3, 138-39.  Robutrad employees allegedly repaired the homes of local Republican officials while still on the county clock.  *Id.*  The investigators requested that the MCSO investigate Deputy Campanella's gossiping in connection with those statements.  *Id.*  Undersheriff Caiola refused to do so.  *Id.* at ¶62.  He did not believe Deputy Campanella's statements "were serious enough" to warrant further inquiry.  *Id.*; ECF No. 60-5, 126:11-15.  Undersheriff Caiola told the investigators, "Don't worry about it.  It will go away."  ECF No. 60-5, 127-28.

A few weeks later, Undersheriff Caiola heard that Deputy Campanella had been telling other MCSO officers that the MCSO charged Deputy Anthony DiPonzio with abuse of sick time for visiting his son in the hospital.  ECF No. 60-2, ¶63.   Deputy DiPonzio's son, a Rochester Police Officer, was shot in the head while on duty in January 2009.  ECF No. 60-5, 122-23. Based on that report, Undersheriff Caiola asked Deputy Scott to conduct an investigation into both instances of Deputy Campanella's gossiping.  *Id.* at ¶64; ECF No. 60-5, 131:11-15.  On May 1, 2009, Deputy Scott, Lieutenant Tomassetti, and Sergeant Lawrence (Deputy Campanella's direct supervisor), interviewed Deputy Campanella.  ECF No. 60-2, ¶67.  During that interview, Scott, Tomassetti, and Lawrence focused almost exclusively on the second gossiping allegation—Deputy Campanella's statements about Deputy DiPonzio.  ECF No. 60-3, 165:16-19.  Two weeks later Deputy Scott closed the investigation without taking disciplinary action.  ECF No. 60-2, ¶73.

On May 14, 2009, Lieutenant Tomassetti gave Deputy Campanella a Memorandum of Record ("MOR") regarding these gossiping allegations.  ECF Nos. 60-2, ¶76; 60-12.  The MCSO issues MROs when officers violate internal rules.  ECF No. 60-2, ¶¶76-78.  The issuance of an MOR is not a form of discipline.  *Id.*  Instead, the MOR is intended to counsel the officer on appropriate behavior.  *Id.*  The MOR issued to Deputy Campanella described the instances of gossiping, noted Deputy Campanella's responses to the allegations, and summarized Deputy

Campanella's violations of the MCSO's code of conduct.  ECF No. 60-12.  The MOR focused on Deputy Campanella's gossiping about Deputy DiPonzio, but it also mentioned the Robutrad matter.  *Id.*  In closing, the MOR warned Deputy Campanella that "[a]ny further action of this type may result in disciplinary action . . . ."  *Id.*

## III.    Analysis

Plaintiffs claim that Defendants retaliated against them because of Deputy Campanella's statements about the Robutrad investigation and Ms. Campanella's association with Greene. They claim that, in response to these protected activities, Defendants took seven adverse employment actions against Deputy Campanella.   Those actions include reassigning Deputy Campanella from the Crime Prevent Unit, investigating Deputy Campanella for gossiping, warning Deputy Campanella that Ms. Campanella's association with Greene would "put [Deputy and Ms. Campanella] in a box," issuing Deputy Campanella an MOR for violating MCSO Rules and Regulations, awarding the Firearm Deputy position to another employee, removing Deputy Campanella from the Operation Safe Child program, and denying Deputy Campanella's requests for overtime.

For these alleged abuses, Plaintiffs seek relief under 42 U.S.C. § 1983.  Section 1983 provides plaintiffs with "a method for vindicating federal rights elsewhere conferred."  *Graham v. Connor*, 490 U.S. 386, 393-394 (1989).  To be entitled to relief under § 1983, a plaintiff must prove that a person acting under the color of state or territorial law deprived the plaintiff of a federal right.  *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *see also Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999).

Plaintiffs claim that Defendants deprived them of their First Amendment rights.  ECF No. 1.  To survive a motion for summary judgment, a public employee alleging retaliation for the exercise of First Amendment rights must demonstrate three things: (1) the plaintiff's speech or

association was constitutionally protected; (2) the plaintiff suffered an adverse employment action; and (3) a causal connection existed between the protected speech and the adverse employment action. *Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir. 2003) (citations and internal quotation marks omitted).  If the plaintiff satisfies those requirements, the defendant may escape liability by showing by a preponderance of the evidence that he or she would have taken the same adverse action in the absence of the protected activity. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 382 (2d Cir. 2003).  If the defendant is able to make such a showing, the plaintiff may still prevail by establishing that the adverse action was in fact motivated by retaliation. *Mandell*, 316 F.3d at 383.

For the purposes of the present motion, Defendants do not dispute that Deputy Campanella's statement about the Robutrad investigation and Ms. Campanella's affiliation with Sheriff O'Flynn's political opponent are protected activities.   ECF No. 60-20.   Rather, Defendants claim that the alleged adverse employment actions are not legally sufficient adverse actions, that Plaintiffs have not established a causal connection between the protected activities and the complained of acts, and that they would have taken several of the complained of acts in absence of the protected activity.  *Id.*  For the reasons stated below, the Court finds that three of the alleged adverse employment actions are not sufficiently adverse and that Defendants would have taken the four remaining actions in the absence of the protected activities.

### a.  Adverse Employment Actions

Plaintiffs failed to satisfy their initial burden with regards to three of the alleged adverse actions because those actions, considered individually and in the aggregate, do not constitute adverse employment actions for the purposes of a First Amendment Retaliation claim.  In the context of a First Amendment retaliation claim, "only retaliatory conduct that would deter a

similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Zelnik v. Fashion Inst. of Tech.,* 464 F.3d 217, 225 (2d Cir. 2006) (internal quotation marks omitted).  That includes fundamental changes like "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999).  But it might also include less severe actions like "negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, transfer from library to classroom teaching . . . ." *Id.*  Ultimately, "whether an undesirable employment action qualifies as being adverse is a heavily fact-specific, contextual determination." *Hoyt v. Andreucci*, 433 F.3d 320, 328 (2d Cir. 2006) (internal quotation marks and citations omitted).

### i.  Denial of Overtime

Plaintiffs claim that, in retaliation for Deputy Campanella's statements and Ms. Campanella's political affiliation, Defendants denied Deputy Campanella's "frequent requests for overtime opportunities."  ECF No. 1.  The denial of overtime opportunities might rise to the level of an adverse employment action in certain circumstances.  *See, e.g.*, *Burhans v. Cty. of Putnam*, No. 06-CV-8325, 2011 WL 1157693, at \*5 (S.D.N.Y. Mar. 25, 2011) (noting that pleading the denial of overtime was sufficient to survive a motion to dismiss in a First Amendment retaliation case).  But to survive summary judgment, Plaintiffs must provide more than conclusory statements about being denied theoretical overtime opportunities.  *See Rivers v. N.Y. City Hous. Auth.*, 176 F. Supp. 3d 229, 253 (E.D.N.Y. 2016) (finding the plaintiff's "broad, conclusory statements that he was treated differently from his similarly situated co-workers with respect to the provision of overtime" did not raise a genuine issue of material fact regarding "whether the overtime denials constitute adverse employment actions").

Plaintiffs have provided no specific instances when Deputy Campanella applied for but did not receive overtime. ECF No. 60-3, 221:11-21. Indeed, when asked whether he received overtime after his meeting with Sheriff O'Flynn on October 20, 2008, Deputy Campanella responded, "Oh, I believe so." ECF No. 60-3, 223:3. Further, to the extent that Deputy Campanella received less overtime in the last four years of his career, the evidence shows that, during that period of time, the MCSO sought to decrease overtime across the board. *See, e.g.*, ECF No. 60-2, ¶103 ("[The] Firearms Deputy position was developed [on June 12, 2009] to minimize overtime generated by using part-time Firearms Instructors."). The evidence does not suggest that Defendants sought to deny Deputy Campanella, in particular, overtime. To the contrary, while Defendants intended to limit overtime generally, the undisputed evidence indicates that Deputy Campanella still received overtime shifts. ECF Nos. 60-2, ¶133; 60-3, 223:3. No rational jury could find that the denial of overtime in these circumstances would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.

### ii. Sheriff O'Flynn's Comment to Deputy Campanella

Plaintiffs also claim that Sheriff O'Flynn made a "thinly veiled threat" to Deputy Campanella in retaliation for Deputy Campanella's statements and Ms. Campanella's political affiliation. ECF No. 1. Generally, a threat of retaliation alone cannot constitute an adverse employment action. *See Murray v. Town of N. Hempstead*, 853 F. Supp. 2d 247, 269 (E.D.N.Y. 2012) ("[T]hreats of termination cannot, by themselves, constitute an adverse employment action."). But there is one exception to that general principle: a threat of retaliation might be sufficient to show constructive discharge. *Grey v. City of Norwalk Bd. of Educ.*, 304 F. Supp. 2d 314, 324 (D. Conn. 2004) ("[T]hreats of termination alone are sometimes sufficient to show constructive discharge."); *Valdes v. New York City Dep't of Env. Protection,* No. 95-CV-10407,

1997 WL 666279, at *3 (S.D.N.Y. Oct. 27, 1997) ("[A]n employer's clearly expressed desire that an employee resign has been held sufficient to find a constructive discharge."). "A constructive discharge . . . occurs when an employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Spence v. Maryland Cas. Co.,* 995 F.2d 1147, 1156 (2d Cir. 1993). The test for determining whether an employee has been constructively discharged is whether "a reasonable person in the employee's shoes would have felt compelled to resign." *Stetson v. NYNEX Service Co.,* 995 F.2d 355, 361 (2d Cir. 1993).

The undisputed facts show that Sheriff O'Flynn told Deputy Campanella that Ms. Campanella's political affiliation would "put [them] in a box" because Ms. Campanella "would run for office as a republican on the same ticket as Sheriff O'Flynn while working for Sheriff O'Flynn's opponent." *Id.* at ¶60. On its face, Sheriff O'Flynn's statement is not threatening. In fact, the undisputed facts show that Sheriff O'Flynn did not mean to threaten Plaintiffs. ECF No. 60-4, 80:17-24. Instead, Sheriff O'Flynn meant to comment on the awkwardness of Ms. Campanella's situation. *Id.* But even interpreting the statement as a threat of retaliation, Plaintiffs' argument fails. The threat alone does not amount to an adverse employment action, *Murray,* 853 F. Supp. 2d at 269, Plaintiffs do not claim that Deputy Campanella was constructively discharged, *see* ECF No. 1, and Deputy Campanella was not constructively discharged. After Sheriff O'Flynn made this remark, Deputy Campanella remained employed by the MCSO for four months short of four years. ECF No. 60-2, ¶8. No reasonable jury could find that a reasonable person in Deputy Campanella's shoes would have felt compelled to resign.

### iii.  Removal from the Operation Safe Child Program

Plaintiffs also claim that Defendants removed Deputy Campanella from the Operation Safe Child program in retaliation for their protected activities. ECF No. 1. Reassignment of

duties can amount to an adverse employment action.  *See Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68-69 (2006) (finding a sufficient evidentiary basis to support the jury's verdict that reassignment "from forklift duty to standard track laborer tasks" would "likely dissuade a reasonable worker from making or supporting a charge of discrimination").[2] However, "reassignment of job duties is not automatically actionable." *Id.* at 69; *see also Eiden v. McCarthy*, 531 F. Supp. 2d 333, 352–53 (D. Conn. 2008) (finding reassignment from the Connecticut Department of Environmental Protection's Underground Storage Tank Enforcement Program to its Remediation Program did not constitute an adverse action).   To constitute an adverse employment action, the reassignment must be "more than de minimis."  *See Davidson v. Chestnut,* 193 F.3d 144, 150 (2d Cir. 1999) (collecting cases).

In *Burlington North*, the Court noted that the plaintiff was reassigned to "more arduous and dirtier" duties.  *Burlington N.*, 548 U.S. at 71.  There, the evidence suggested the original assignment "required more qualifications," which was "an indication of prestige."  *Id.*  The evidence also suggested that the original assignment "was objectively considered a better job" and that "the male employees resented [the plaintiff] for occupying it."  *Id.*  In contrast, in *Eiden*, there was no evidence to suggest that the plaintiff's duties before he was reassigned differed from his duties after he was reassigned.  *Eiden*, 531 F. Supp. 2d at 53.  Before and after reassignment, the plaintiff was a "general worker," and his job was to "provide program support and technical support to Connecticut agencies."  *Id.*  Before and after reassignment, his duties included categorically similar, administrative tasks.  *Id.*  Because the plaintiff "was performing the same duties with the same job title at the same rate of pay," the court concluded that the

---

[2]        *Burlington Northern* is a Title VII retaliation case.  *See Burlington N.*, 548 U.S. at 53.  Nonetheless, it is applicable here.  The Second Circuit has noted that its test for determining whether an employment action is adverse in the context of First Amendment retaliation claims "has always been []equivalent to the standard set forth in *Burlington Northern.*"  *Zelnik*, 464 F.3d at 227.

reassignment "would not have discouraged a reasonable worker from asserting his First Amendment rights." *Id.*

Like *Eiden*, there is no indication that Deputy Campanella's change in duties would have discouraged a reasonable worker from exercising his or her First Amendment rights. Operating the Operation Safe Child machine involved fingerprinting children, taking their picture, and printing an identification card. ECF No. 60-2, ¶91. It was not a daily—or even typical—duty of Deputy Campanella's. ECF No. 60-3, 124:13. When asked how many hours per week he spent operating the Operation Safe Child Machine, Deputy Campanella responded, "That's a good question. It was a scheduled event, usually on the weekends, so whenever somebody would call and offer for a group I would do it. I'm not sure." *Id.* At any rate, when Deputy Campanella did operate the Operation Safe Child machine, it was still only one discrete duty out of many. In addition to operating the Operation Safe Child machine, Deputy Campanella was a SWAT Team Leader, *id.* at 45:11, and a firearms instructor. ECF No. 60-20, ¶7. He also taught Senior Citizens Academy, did Fatal Crash Simulations, led health and safety talks, and helped communities establish Neighborhood Watch programs. *Id.* at ¶93; *see also* ECF No. 60-3. Thus, although Defendants removed one discrete duty from his plate, on balance, Deputy Campanella's job duties remained the same.

Plaintiffs seem to suggest that operating the Operation Safe Child machine was significant because of the overtime opportunities it afforded Deputy Campanella. But that argument is unavailing. As an initial matter, even if removal from the Operation Safe Child program left Deputy Campanella with fewer opportunities for overtime, it is not clear that the accompanying loss of overtime would make the action adverse. *Cf. Brown v. City of Syracuse*, 673 F.3d 141, 151 (2d Cir. 2012) (recognizing that, in the context of a Title VII discrimination claim, suspension with pay pending an investigation does not, "without more," constitute an

adverse employment action and concluding that suspension with pay accompanied by loss of overtime pay did not amount to the requisite "more").   But more to the point, there is no evidence to suggest that removal from the Operation Safe Child program actually resulted in fewer overtime opportunities for Deputy Campanella.   Many of Deputy Campanella's duties as a CPO afforded him overtime opportunities:   Deputy Campanella received overtime for the firearms home safety course he led in the evenings.   ECF No. 60-3, 35:12-20.   He received overtime for the evenings he spent helping communities establish neighborhood watch programs.  *Id.* at 41:16-22.   When called out for a SWAT operation outside of his usual work hours, Deputy Campanella received overtime.   *Id.* at 45:5-8.   Deputy Campanella even picked up road patrol shifts as a CPO, and for those, he received overtime.   *Id.* at 99:4-8.

In effect, this reassignment resulted in "the same duties with the same job title at the same rate of pay."  *Eiden*, 531 F. Supp. 2d at 353.   After Deputy Campanella was removed from the Operation Safe Child program, only one aspect of his job changed: he was no longer creating identification cards for children on the occasional weekend.   No reasonable jury could conclude that an officer of ordinary firmness, who was a SWAT Team Leader and a firearms instructor, and who participated in various other community education and safety programs, would be discouraged from exercising a constitutional right for fear of being removed from portrait and fingerprint duty.

### i.   Adverse Employment Actions in Aggregate

Taken together, the denial of overtime, Sheriff's comment, and removal from the Operation Safe Child program still fail to constitute an adverse employment action.   To determine whether an action is sufficiently adverse, courts must consider the actions both individually and in the aggregate.  *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) ("[E]ven minor acts of retaliation can be sufficiently substantial in gross as to be actionable.") (citing

*Zelnik*, 464 F.3d at 227).  Even when placed alongside removal from the Operation Safe Child program, Plaintiffs' overtime and "thinly veiled threat" allegations remain fatally flawed. Plaintiffs' overtime claim lacks specificity and Sheriff O'Flynn's threat is simply not enough to carry removal from the Operation Safe Child program from not-adverse to sufficiently adverse. "Zero plus zero is zero."  *See Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 572 (2d Cir. 2011) (finding an investigation, counseling, two threats of termination, and a change from day shift to night shift, among other things, considered individually and in aggregate, did not constitute adverse employment actions).  Simply put, even when faced with all three of these actions, an officer of ordinary firmness would not be discouraged from exercising a constitutional right.

### b.  Legitimate, Non-Retaliatory Reasons for the Remaining Adverse Actions

Even assuming that Plaintiffs have established a *prima facie* case in regards to the remaining alleged adverse employment actions, Defendants are entitled to summary judgment because the evidence shows that they would have taken those actions in absence of the protected activities.  The First Amendment protects an employee from being punished because he or she exercised a constitutional right.  *Mt. Healthy*, 429 U.S. at 286 ("A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct.").  But it does not create a blanket of immunity that shields such an employee from any adverse employment action.  *Id.* ("But that same candidate ought not to be able, by engaging in [protected] conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.").  The First Amendment is satisfied as long as that employee "is placed in no worse a position than if he had not engaged in the conduct." *Id.* at 285-86.  To that end, "the government

can avoid liability if it can show that it would have taken the same adverse action in absence of the protected speech." *Anemone v. Metropolitan Transp. Authority*, 629 F.3d 97, 114 (2d Cir. 2011) (citing *Heil v. Santoro*, 147 F.3d 103, 109 (2d Cir. 1998)).

Here, Defendants present undisputed evidence that they would have taken several of the alleged adverse employment actions in absence of Plaintiffs' protected activities. Those actions include (1) reassigning Deputy Campanella from the Community Outreach Unit, (2) investigating Deputy Campanella for gossiping, (3) giving him an MOR following that investigation, and (4) not awarding Deputy Campanella the firearm training position. ECF No. 60-20.

First, the undisputed evidence indicates that Defendants reassigned Deputy Campanella from his CPO position to road patrol because the MCSO began putting time limits on special assignments. *Id.* at ¶39. The CPO position is a special assignment within the Community Services Unit. *Id.* at ¶35. Indeed, the MCSO had three CPOs at the time that Deputy Campanella's reassignment was announced, and the MCSO announced that all three of those CPO were going to be reassigned.[3] *Id.* at ¶38. The undisputed evidence demonstrates that Defendants would have reassigned Deputy Campanella even in the absence of Deputy Campanella's protected statements of Ms. Campanella's political affiliation.

Second, the undisputed evidence indicates that Defendants investigated Deputy Campanella for gossiping because of statements that Deputy Campanella made about Deputy DiPonzio, not because of the protected statements Deputy Campanella made about Robutrad matter. *Id.* at ¶61-64. When the two MCSO Major Crimes Investigators reported that Deputy Campanella was gossiping about the Robutrad investigation, Undersheriff Caiola told them, "Don't worry about it. It will go away." ECF No. 60-5, 127-28. When the investigators

---

[3] Deputy Jim Godshall retired before the reassignment became effective. ECF No. 60-2, ¶38, 46. Deputy Dan Lyons and Deputy Campanella were transferred to Road Patrol on January 25, 2010. *Id.* at 44-45.

requested that the MCSO investigate Deputy Campanella's gossiping in connection with those statements, Undersheriff Caiola refused because he did not think the statements warranted investigation. *Id.* at ¶62. In fact, "[e]verybody talked about" the Robutrad matter. ECF No. 60-3, 141:3. According to Deputy Campanella, the MCSO did not even instruct its employees not to discuss the Robutrad matter. *Id.* at 141:8-11. Further, when Deputy Scott, Lieutenant Tomassetti, and Sergeant Lawrence interviewed Deputy Campanella about his gossiping, "Robutrad was a small part of the meeting." *Id.* at 165:17-19. Indeed, Deputy Campanella does not remember the officers "saying anything about Robutrad as much as DiPonzio." *Id.* at 166:7-8.

In contrast, when Undersheriff Caiola heard that Deputy Campanella was telling officers that the MCSO charged Deputy DiPonzio with abuse of sick time for visiting his son in the hospital, he found that allegation to be "upsetting." ECF No. 60-5, 129:13-14. Undersheriff Caiola felt that gossiping about another officer, one who "had enough to worry about," was "a bad thing to do." *Id.* at 129:4-11. Based on that report, Undersheriff Caiola asked Deputy Scott to investigate Deputy Campanella's gossiping. ECF No. 60-2, ¶64. Although Undersheriff Caiola asked Deputy Scott to look into both allegations, *id.* at 131:14-15, he did so only after hearing that Deputy Campanella was gossiping about Deputy DiPonzio. *Id.* at 128:17-20. Deputy Campanella's gossiping about Deputy DiPonzio was what really concerned Undersheriff Caiola and motivated him to act. *Id.* at 24-25. Thus, the undisputed evidence indicates that Defendants would have investigated Deputy Campanella for gossiping even if he had not made the protected statements about the Robutrad investigation.

Third, like the gossiping investigation itself, the MOR that followed stemmed from Deputy Campanella's gossiping about Deputy DiPonzio. After Deputy Scott, Lieutenant Tomassetti, and Sergeant Lawrence interviewed Deputy Campanella, Scott and Tomassetti

discussed what the outcome of the investigation should be.   ECF No. 60-10, 87-88.   They decided Lieutenant Tomassetti should write an MOR summarizing Deputy Campanella's violations of the MCSO's code of conduct.   *Id.*   Further, the MOR only briefly mentions the Robutrad matter.   *See* ECF No. 60-12.   The MOR is ten paragraphs long, and only one sentence within one of those paragraphs discusses Deputy Campanella's statements about the Robutrad matter.   Accordingly, Defendants would have issued the MOR even if Deputy Campanella had not spoken to others about the Robutrad matter.

Finally, the evidence indicates that Defendants did not assign Deputy Campanella to the Firearms Deputy position because they instead assigned a candidate who received more recommendations.   ECF No. 60-2, ¶120-21.   In deciding who would fill the Firearms Deputy position, seven officers voted to recommend a candidate.   *Id.* at 120.   One candidate received four out of those seven votes.   *Id.*   That officer was awarded the position.   *Id.* at 121.   Here, too, the undisputed evidence demonstrates that Defendants would have taken this action even in absence of Deputy Campanella's statement about the Robutrad investigation and Ms. Campanella's political affiliation.

Plaintiffs have presented no evidence in response to suggest that these adverse actions were in fact motivated by retaliation.   Based on the undisputed evidence, no reasonable jury would conclude that Defendants took these four actions because of Deputy Campanella's protected statements and Ms. Campanella's political affiliation.   Accordingly, summary judgment is appropriate.

**CONCLUSION**

For the reasons stated above, Defendants' Motion for Summary Judgment (ECF No. 60) is GRANTED.   Plaintiffs' Complaint is dismissed with prejudice, and the Clerk of Court is directed to close this case.


IT IS SO ORDERED.

Dated: February 6, 2017
        Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge

United States District Court