UNITED STATES DISTRICT COURT
<u>WESTERN DISTRICT OF NEW YORK</u>

CHARLES E. CAMPANELLA, II,
DEBORAH S. CAMPANELLA,

Plaintiffs,

Case # 10-CV-6236-FPG

v.

DECISION AND ORDER

MONROE COUNTY SHERIFF PATRICK M. O'FLYNN,
MONROE COUNTY UNDERSHERIFF GARY CAIOLA,
CHIEF DEPUTY STEVEN SCOTT,
LIEUTENANT LOU TOMASSETTI, and other known
or unknown members of the Monroe County
Sheriff's Office, individually and in their
official capacities,[1]

Defendants.

## INTRODUCTION

On April 29, 2010, Plaintiffs Charles ("Deputy Campanella") and Deborah Campanella ("Ms. Campanella") (collectively "Plaintiffs") brought this action under 42 U.S.C. § 1983 against Defendants Monroe County, the Monroe County Sheriff's Office ("MCSO"), and MCSO employees Patrick M. O'Flynn ("Sheriff O'Flynn"), Gary Caiola ("Undersheriff Caiola"), Steven Scott ("Chief Scott"), and Lucio Tomassetti ("Lieutenant Tomassetti") (collectively "Defendants").  ECF No. 1.  Plaintiffs alleged that Defendants retaliated against Deputy Campanella in violation of Plaintiffs' constitutional rights.  *Id.*  Specifically, Plaintiffs allege that Defendants investigated, threatened, reprimanded, reassigned, and refused to promote Deputy Campanella in retaliation for Ms. Campanella's association with a political rival and Deputy Campanella's statements about the investigation into a local matter.  *Id.*

---

[1]     Plaintiffs originally named the County of Monroe and the Monroe County Sheriff's Office in this suit, but the Court dismissed the claims against those defendants.  ECF No. 24.

Initially, Plaintiffs' Complaint alleged multiple First Amendment and Due Process violations as well as libel, slander, defamation, and negligent failure to train and supervise. *Id.* However, in resolving Defendants' motion for judgment on the pleadings, ECF No. 11, Judge Larimer dismissed all but two of Plaintiffs' First Amendment claims. ECF No. 24. Additionally, Judge Larimer dismissed all of Plaintiffs' claims against Monroe County and MCSO. *Id.* The case was then transferred to this Court. ECF No. 33. Plaintiffs' surviving claims allege that Sheriff O'Flynn, Undersheriff Caiola, Chief Scott, and Lieutenant Tomassetti took seven adverse employment actions against Deputy Campanella in retaliation for two things: Deputy Campanella's statement about the investigation of a local construction firm and Ms. Campanella's affiliation with a man who ran as the Democratic candidate for Monroe County Sheriff in 2009. *Id.*

On July 19, 2016, Defendants moved for summary judgment. ECF No. 60. Plaintiffs' Response was due by August 16, 2016. *See* L.R. CIV. PRO. 7(b)(2)(A). But Plaintiffs did not respond to Defendants' motion or request an extension. Accordingly, on February 6, 2017, the Court issued a decision granting the Defendants' Motion for Summary Judgment. *See* ECF No. 61. On March 3, 2017, Plaintiffs moved to set aside that decision. *See* ECF No. 65. Under Federal Rule of Civil Procedure 60(b)(1), Plaintiffs argued that their failure to respond to the summary judgment motion was the result of a reasonable mistake. *See id.* The Court agreed that the mistake was reasonable, granted Plaintiffs' motion, and allowed Plaintiffs to respond to Defendants' Motion for Summary Judgment. *See* ECF No. 68. On May 26, 2017, Plaintiffs filed their response to Defendants' Motion for Summary Judgment. *See* ECF No. 69. Defendants filed their reply on June 2, 2017. *See* ECF No. 70.

Having reviewed the parties' submissions, the Court finds that genuine issues of material fact exist as to whether Defendants conducted an investigation into Deputy Campenalla's

gossiping and issued a Memorandum of Record in connection with that investigation in retaliation for Ms. Campanella's association with Sheriff O'Flynn's political opponent. With respect to Plaintiffs' other alleged adverse employment actions and protected activity, Defendants are entitled to summary judgment. Accordingly, Defendants' Motion for Summary Judgment is granted in part and denied in part.

## FACTUAL BACKGROUND

Charles Campanella worked for MCSO from 1988 to 2012. ECF Nos. 60-2, ¶ 2; 69-1, ¶ 2. During the relevant periods of Deputy Campanella's employment with MCSO, Patrick O'Flynn was the Monroe County Sheriff. *Id.* at ¶ 9. Sheriff O'Flynn was first elected in 2001, ECF No. 60-4, 11:2-4, and was reelected in 2005, 2009, and 2013. *Id.* at 11:18-20. In each election, Sheriff O'Flynn ran as the Republican Party's candidate. *Id.* 72:23-25. Under Sheriff O'Flynn, and at all times relevant to the issues in this case, Gary Caiola was the Undersheriff. ECF No. 60-2, ¶ 10. Steven Scott was the Chief Deputy. *Id.* at ¶ 11. Lucio Tomassetti was the Special Operations Commander. *Id.* at ¶ 27.

Ms. Campanella works in the real estate and insurance businesses and is active in local government. ECF No. 60-6, 6-7, 18. In 2008, Ms. Campanella won the Republican Party's endorsement for a town council seat for the Town of Riga. *Id.* at 50:7-9; ECF No. 60-2, ¶ 16. That same year, Ms. Campanella began working as a part-time business manager for Leader Security Services ("Leader"). ECF No. 60-2, ¶ 17. Leader was founded by Daniel Greene. *Id.* at ¶ 14. Before founding Leader, Greene worked for MCSO as an undersheriff under Sheriff O'Flynn. *Id.* at ¶ 9, 13. On May 9, 2009, Greene announced that he was running for Sheriff, as the Democratic Candidate, against Sheriff O'Flynn. *Id.* at ¶ 15. In that same general election, Ms. Campanella ran for town counsel on the Republican ticket alongside Sheriff O'Flynn. ECF

No. 60-6, 50:7-9.   Ms. Campanella worked for Leader until December 2012.   ECF No. 60-6, 21:10-12.

### a. Deputy Campanella's Employment at MCSO Prior to Ms. Campanella's Employment at Leader Securities

During his 24 years at MCSO, Deputy Campanella's duties and assignments varied.   ECF Nos. 60-2, ¶¶ 3-7; 69-1, ¶¶ 3-7.   From 1988 until 1990, Deputy Campanella worked as a part-time Deputy Sheriff.   ECF No. 60-3.   In 1990, Deputy Campanella became a full-time Road Patrol Deputy.   *Id.*   Two or three years later, Deputy Campanella was assigned to his first special assignment, the DARE program.   *Id.*   After three or four years in the DARE Program, Deputy Campanella was assigned to the Warrant Unit.   *Id.*   After spending three or four years in the Warrant Unit, Deputy Campanella was assigned to the Narcotics Unit.   *Id.*   In 2005, Deputy Campanella was assigned to the Community Services Unit as a Crime Prevention Officer ("CPO").   *Id.*; s*ee also* ECF Nos. 60-2, ¶¶ 34, 41; 69-1, ¶¶ 34, 41.

While carrying out his road patrol and special assignment duties, Deputy Campanella also took on some side assignments for MCSO.   ECF No. 60-3 at 20-21.   Deputy Campanella was a member of the SWAT team for 14 years, between 1994 and 2008, and a SWAT Team Leader for four years, from 2008 until his retirement.   ECF No. 60-2, ¶ 3-6.   Deputy Campanella took on additional road patrol duties.   ECF No. 60-3, 99:4-8.   Deputy Campanella was a firearms instructor during Police Academy classes.   ECF Nos. 60-2, ¶ 7; 69-1, ¶ 7.   Lastly, Deputy Campanella's duties as a member of the Community Services Unit involved leading a range of community programs.   ECF Nos. 60-2, ¶¶ 91-93; 69-1, ¶¶ 91-93.   Those programs included Senior Citizens Academy, Fatal Crash Simulations, firearms and alcohol safety talks, Neighborhood Watch meetings, and Operation Safe Child.[2]   ECF Nos. 60-2, ¶ 93; 69-1,¶ 93.

---

[2]       The Operation Safe Child program involves operating a machine that creates identification cards for children.  ECF Nos. 60-2, ¶ 91; 69-1,¶ 91.

As a CPO, Deputy Campanella's standard hours were Monday through Friday, from 8 a.m. to 4 p.m. ECF No. 60-3, 41:10. But taking on additional duties and participating in community programs often required him to work evenings and weekends. *Id.* at 35:12-20 (Deputy Campanella led firearms safety talks in the evenings); *id.* at 41:16-22 (same for Neighborhood Watch); *id.* at 45:5-8 (SWAT operations often required Deputy Campanella to work evenings and weekends); *id.* at 99:4-8 (same for road patrol shifts); *id.* at 123:20-23 (Deputy Campanella operated the Operation Safe Child machine on the weekends). When Deputy Campanella worked in the evening or over the weekend, he received overtime pay. *Id.* at 41:19-22.

### b. Deputy Campanella's Employment at MCSO following Ms. Campanella's Employment at Leader

Beginning in 2008, some aspects of Deputy Campanella's employment with MCSO changed. That year, MCSO began to limit the amount of time a deputy could remain assigned to a specialized unit. ECF Nos. 60-2, ¶ 37; 69-1, ¶ 37. To that end, MCSO reassigned deputies in at least some specialized units. ECF Nos. 60-2, ¶ 42; 69-1, ¶ 42. That included Deputy Campanella. ECF Nos. 60-2, ¶¶ 34-35; 69-1, ¶¶ 34-35. On September 23, 2008, Chief Scott announced that MCSO would be reposting the CPO positions and reassigning Deputy Campanella and the two other CPOs. ECF Nos. 60-2, ¶¶ 31, 38; 69-1, ¶¶ 31, 38. Deputy Campanella remained in the CPO position until September of 2009, ECF Nos. 60-2, ¶ 41; 69-1, ¶ 41; 60-3, at which time he was assigned to work temporarily as a full-time Firearm Instructor.[3] ECF Nos. 60-2, ¶ 42; 69-1, ¶ 42. On January 25, 2010, Deputy Campanella was reassigned to Road Patrol. ECF Nos. 60-2, ¶ 44; 69-1, ¶ 44. At that time, the two other CPOs were either also reassigned to Road Patrol or retired. ECF Nos. 60-2, ¶¶ 45-46; 69-1, ¶¶ 45-46.

---

[3]    Deputy Campanella was placed in the Firearms Deputy position as MCSO transitioned from one type of firearm to another. ECF Nos. 60-2, ¶ 42; 69-1, ¶ 42.

Plaintiffs claim that, around the time that Chief Scott announced the CPO reassignments, Chief Scott and Sheriff O'Flynn commented on Ms. Campanella's association with Dan Greene. First, Plaintiffs claim that, in reference to Ms. Campanella, Chief Scott asked Deputy Campanella, "[H]ow is that going to work, with her working for a Democrat?" and "Isn't she afraid that will be a problem?" ECF No. 69-5 at 4. Second, on October 20, 2008, Sheriff O'Flynn commented on Ms. Campanella's association with Dan Greene while meeting with Deputy Campanella at a Starbucks. ECF Nos. 60-2, ¶ 55; 69-1, ¶ 55. Either before or during this meeting, Sheriff O'Flynn learned that Ms. Campanella was working for Dan Greene at Leader Security. ECF Nos. 60-2, ¶ 56; 69-1, ¶¶ 22, 56. In the context of a conversation about Greene's potential campaign for sheriff, Sheriff O'Flynn said to Mr. Campanella, "that would put you in a box if [Greene] runs." ECF Nos. 60-2, ¶ 95; 69-1, ¶ 59.

In the spring of 2009, MCSO officers investigated allegations that Deputy Campanella was inappropriately gossiping. ECF Nos. 60-2, ¶¶ 61-67; 69-1, ¶¶ 61-67. In April 2009, MCSO Major Crimes Investigators Patrick Crough and Kevin Garvey told Undersheriff Caiola that they heard Deputy Campanella spreading a rumor that MCSO officers might face criminal charges for conducting an improper investigation of the Robutrad matter. ECF Nos. 60-2, ¶ 61; 69-1, ¶ 61. Robutrad is a now-defunct local company that once did construction work for Monroe County. ECF No. 60-3, 138-39. Robutrad employees allegedly repaired the homes of local Republican officials while still on the county clock. *Id.* Crough and Garvey requested that MCSO investigate Deputy Campanella's gossiping in connection with those statements. ECF Nos. 60-2, ¶ 61; 69-1, ¶ 61. But Undersheriff Caiola did not believe Deputy Campanella's statements "were serious enough" to warrant further inquiry. ECF Nos. 60-2, ¶ 62; 69-1, ¶ 62; 60-5, 126:11-15.

A few weeks later, Undersheriff Caiola heard that Deputy Campanella had been telling other MCSO officers that MCSO charged Deputy Anthony DiPonzio with abuse of sick time for

visiting his son in the hospital.  ECF Nos. 60-2, ¶ 63; 69-1, ¶ 63.   Deputy DiPonzio's son, a
Rochester Police Officer, was shot in the head while on duty in January of 2009.  ECF No. 60-5,
122-23.  Based on that report, Undersheriff Caiola asked Chief Scott to conduct an investigation
into both instances of Deputy Campanella's gossiping.  ECF Nos. 60-2, ¶ 64; 69-1, ¶ 64; 60-5,
131:11-15.  On May 1, 2009, Chief Scott, Lieutenant Tomassetti, and Sergeant Lawrence
interviewed Deputy Campanella.  ECF Nos. 60-2, ¶ 67; 69-1, ¶ 67.   During that interview,
Deputy Campanella claims to have requested warnings under *Garrity v. New Jersey*, 385 U.S.
493 (1967), and union representation.  ECF No. 69-2, ¶ 22.   But according to Deputy
Campanella, he was told he was not entitled to *Garrity* warnings or union representation.  *Id.*
Deputy Campanella also claims that the officers also interviewed at least four other MCSO
deputies in connection with this investigation.  *See id.*

On May 14, 2009, Lieutenant Tomassetti issued Deputy Campanella a Memorandum of
Record ("MOR") regarding these gossiping allegations.  ECF Nos. 60-2, ¶ 76; 69-1, ¶ 76; 60-12.
The MOR described the instances of gossiping, noted Deputy Campanella's responses to the
allegations, and summarized Deputy Campanella's violations of MCSO's code of conduct.  ECF
No. 60-12.  The MOR focused on Deputy Campanella's gossiping about Deputy DiPonzio, but it
also mentioned the Robutrad matter.  *Id.*   Sheriff O'Flynn, Undersheriff Caiola, Chief Scott,
Internal Affairs, and Deputy Campanella's personnel file were copied on the MOR.  ECF No.
27-15.  In closing, the MOR warned Deputy Campanella that "[a]ny further action of this type
may result in disciplinary action . . . ."  *Id.*

On June 12, 2009, MCSO created a full-time and permanent Firearms Deputy position in
an attempt to reduce the amount of overtime that temporary and part-time instructors generated.
ECF Nos. 60-2, ¶ 98; 69-1, ¶ 98.  Deputy Campanella and six other officers applied for that
position.  ECF Nos. 60-2, ¶¶ 101, 104; 69-1, ¶¶ 101, 104.  Seven officers sat on the selection

committee.  ECF Nos. 60-2, ¶¶ 111-12, 120; 69-1, ¶¶ 111-12, 120.  Four of the seven officers on the selection committee recommended Deputy Brian Moore for the position.  ECF Nos. 60-2, ¶ 120; 69-1, ¶ 120.  On June 30, 2009, MCSO awarded the position to Deputy Moore.  ECF Nos. 60-2, ¶ 113; 69-1, ¶ 113.  Finally, about one month later, Deputy Campanella was removed from the Operation Safe Child assignment.  ECF Nos. 60-2, ¶ 93; 69-1, ¶ 93.

Plaintiffs attribute these events to Ms. Campanella's association with Dan Greene and Leader Security.  *See generally* ECF No. 69-5.  Plaintiffs claim that, on September 24, 2008, Sergeant Jeff Wagner told Deputy Campanella that Defendants reassigned him to Road Patrol because of Ms. Campanella's association with Dan Greene and Leader Security.  *See* ECF No. 69-2, ¶ 13.  Plaintiffs also claim that Sergeant Scott Walsh told Deputy Campanella that, in August of 2008, Sheriff O'Flynn and Undersheriff Caiola "were watching everyone at Leader [Security]," intended to "take[] down" everyone affiliated with Leader Security, and began monitoring the Leader Security website.[4]  *See* ECF No. 69-5; *see also* ECF No. 60-3, *Deposition of Deputy Campanella*, at 79: 13-15.  Conversely, Defendants claim that the changes in Deputy Campanella's employment were unrelated to Ms. Campanella's association with Dan Greene and Leader Security.  *See generally* ECF No. 60-20.  Defendants contend that the changes either occurred before MCSO learned of Ms. Campanella's employment or were taken for a legitimate reason.  *See id.* at 1.

After 24 years with MCSO, Deputy Campanella retired on June 23, 2012.  ECF Nos. 60-2, ¶ 8; 69-1, ¶ 8.

## SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted where the moving party shows that "there is no genuine dispute as to any material fact" and that the moving party "is entitled to

---

[4]    Sergeant Walsh denies making these statements.  *See* ECF No. 60-9, *affidavit of Scott Walsh*, ¶¶ 8.

judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute regarding such a fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Thus, when presented with a motion for summary judgment, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

The moving party bears the burden of showing that there are no genuine disputes of material fact and that the moving party is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). To that end, the Court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. *Id.* at 158. That is to say, "on summary judgment the inferences to be drawn from the underlying facts contained in the moving party's materials must be viewed in the light most favorable to the party opposing the motion." *Id.* at 158-59 (quoting another source) (internal brackets omitted).

## DISCUSSION

Section 1983 provides plaintiffs with "a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-394 (1989). To be entitled to relief under § 1983, a plaintiff must prove that a person acting under the color of state or territorial law deprived the plaintiff of a federal right. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *see also Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999). Here, Plaintiffs claim that Defendants, by taking seven adverse employment actions against Deputy Campanella in retaliation for Deputy Campanella's speech and Ms. Campanella's political association, deprived them of their First Amendment rights. ECF No. 1.

A public employee alleging retaliation for the exercise of First Amendment rights must demonstrate three things to establish a prima facie case: (1) the plaintiff's speech or association was constitutionally protected, (2) the plaintiff suffered an adverse employment action, and (3) a causal connection existed between the protected speech and the adverse employment action. *Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir. 2003) (citations and internal quotation marks omitted). Notably, the burden of establishing a prima facie case is a "modest" one. *Viola v. Philips Med. Sys. of N. Am.,* 42 F.3d 712, 716 (2d Cir. 1994). The Second Circuit has even characterized it as "minimal." *Roge v. NYP Holdings, Inc.,* 257 F.3d 164, 168 (2d Cir. 2001). If the plaintiff satisfies that burden, the defendant must then, by a preponderance of the evidence, show that he or she would have taken the same adverse action in the absence of the protected activity. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 382 (2d Cir. 2003). If the defendant makes such a showing, the plaintiff must demonstrate that the adverse action was in fact motivated by retaliation. *Mandell*, 316 F.3d at 383.

Defendants assert that they are entitled to summary judgment because (1) six of Plaintiffs' seven alleged adverse employment actions are not sufficiently adverse, (2) no causal connection exists between the protected activities and the complained-of acts, and (3) Defendants had legitimate, non-retaliatory reasons for taking five of the seven alleged adverse employment actions.[5] In response to Defendants' non-retaliatory reasons for taking the alleged adverse employment actions, Plaintiffs point to evidence of pretext. The Court finds that genuine issues of material fact exist as to whether Defendants retaliated against Deputy

---

[5] For the purpose of this motion, Defendants do not dispute that Plaintiffs engaged in activities protected by the First Amendment. *See* ECF No. 60-20 at 7, n.2.

Campanella in violation of the First Amendment by conducting an investigation into his gossiping and subsequently issuing him a Memorandum of Record.[6]

### a. Deputy Campanella's Statements about the Robutrad Investigation

As an initial matter, Plaintiffs have failed to demonstrate a prima facie case of First Amendment retaliation in connection with Deputy Campanella's statements about the Robutrad investigation. Plaintiffs' retaliation claim is rooted in two protected activities: Ms. Campanella's political association and Deputy Campanella's statements about the Robutrad investigation. *See* ECF No. 1. Although Plaintiffs' claim that Deputy Campenalla's statements about the Robutrad investigation amounted to speech protected by the First Amendment survived Defendants' Motion for Judgment on the Pleadings, *see* ECF No. 24 at 13, Plaintiffs' Response to Defendants' Motion for Summary Judgment fails to mention it. *See* ECF No. 69-5. To survive summary judgment, Plaintiffs must demonstrate that the protected activity was causally connected to an adverse employment action. *See Johnson*, 342 F.3d at 112. Because Plaintiffs have not shown a causal connection between Deputy Campanella's statements about the Robutrad investigation and any alleged adverse employment action, summary judgment is warranted with respect to that aspect of Plaintiffs' claim.

### b. Defendants' Investigation into Deputy Campanella's Gossiping

Regarding Plaintiffs' allegation that, in retaliation for Ms. Campanella's political association, Defendants investigated Deputy Campanella for gossiping and consequently issued him an MOR, genuine disputes of fact preclude summary judgment.

### i. Adverse Employment Action

In the context of a First Amendment retaliation claim, "only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her

---

[6]     Although Plaintiffs' remaining alleged adverse employment actions do not survive Defendants' Motion for Summary Judgment, evidence of those acts helps create context for Plaintiffs' surviving claim. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 88 (2d Cir. 2015).

constitutional rights constitutes an adverse action." *Zelnik v. Fashion Inst. of Tech.,* 464 F.3d 217, 225 (2d Cir. 2006) (internal quotation marks omitted). That includes fundamental changes like "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999), *abrogated on other grounds by Lore v. City of Syracuse*, 670 F.3d 127 (2d Cir. 2012). But it might also include less severe actions like "negative evaluation letters" and "express accusations of lying." *Id.* Ultimately, "whether an undesirable employment action qualifies as being adverse is a heavily fact-specific, contextual determination." *Hoyt v. Andreucci*, 433 F.3d 320, 328 (2d Cir. 2006) (internal quotation marks and citations omitted).

An investigation into an employee's misconduct may amount to an adverse employment action. The Second Circuit has found that facing "disciplinary charges" and being subjected to "administrative disciplinary proceedings" could deter officers who wished to exercise their First Amendment rights. *Washington v. County of Rockland,* 373 F.3d 310, 320 (2d Cir. 2004). In *Washington*, the Second Circuit disagreed with the district court's conclusion that disciplinary charges and investigatory proceedings could not, as a matter of law, amount to an adverse employment action. *Id.* The court noted that the proceedings at issue there carried potential consequence—they could lead to a 30-day suspension. *Id.* Accordingly, the court concluded that it could not say that, as a matter of law, that the proceedings would not have a deterrent effect. *Id.* For that reason, the court decided that the issue implicated a material question of fact that the district court should have reserved for the jury. *Id.*; *see also Russo v. City of Hartford*, 341 F. Supp. 2d 85, 99 (D. Conn. 2004) (finding that "the question of whether drug testing and investigation constitute adverse employment actions creates an issue of material fact to be resolved by a jury").

Where courts have found that disciplinary charges and investigatory proceedings were insufficient to demonstrate adverse employment actions, they have relied on the fact that the charges or investigations at issue did not result in subsequent employment consequences. *See Kane v. Krebser*, 44 F. Supp. 2d 542, 546-47 (S.D.N.Y. 1999) (highlighting the fact that a reprimand letter, which resulted from an investigation, was expunged from employee's file the following day); *Radolf v. Univ. of Conn.*, 364 F. Supp. 2d 204, 224 (D. Conn. 2005) (emphasizing that the investigation exonerated the plaintiff and that the accusations did not result in discipline). In contrast, courts have found disciplinary charges and investigatory proceedings could amount to adverse employment actions where the plaintiff could point to some tangible, adverse consequence that could result from the charges or investigation. *See Washington,* 373 F.3d at 320; *Ayiloge v. City of New York*, No. 00-CV-5051, 2002 WL 1424589, at *12 (S.D.N.Y. June 28, 2002) (finding that disciplinary charges that led to one adverse finding, which could "affect future employment," amounted to an adverse employment action).

Here, genuine disputes of material fact preclude the Court from finding as a matter of law that Defendants' investigation of Deputy Campanella's alleged gossiping does not amount to an adverse employment action. In April 2009, Undersheriff Caiola asked Chief Scott to investigate allegations that Deputy Campanella was gossiping. ECF Nos. 60-2, ¶ 64; 69-1, ¶ 64; 60-5, 131:11-15. On May 1, 2009, Chief Scott, Lieutenant Tomassetti, and Sergeant Lawrence interviewed Deputy Campanella, among others, in connection with that investigation. ECF Nos. 60-2, ¶ 67; 69-1, ¶ 67. Two weeks later, Lieutenant Tomassetti issued Deputy Campanella an MOR documenting three violations of MCSO's code of conduct. ECF Nos. 60-2, ¶ 76; 69-1, ¶ 76; 60-12; *see also* ECF No. 27-15. That MOR was placed in Deputy Campanella's personnel file. *See* ECF No. 27-15. What the parties dispute is the significance of the MOR. While Defendants claim that the MOR is merely "counseling," *see* ECF No. 60-2, ¶¶ 78, 84, Plaintiffs

claim that an MOR creates employment consequences.  *See* ECF No. 69-1, ¶¶ 78, 84.  Plaintiffs assert that an MOR can affect "pay raises, duty assignments, specialized assignments and promotions."  ECF No. 69-5 at 14 (citing ECF No. 69-3, *Declaration of Thomas W. Burns*).  A reasonable jury could agree with Plaintiffs' interpretation of the significance of the MOR and conclude that the investigation, and resulting MOR, would deter a similarly situated individual from exercising his or her constitutional rights.

### ii.  Causal Connection

 In addition to establishing that Deputy Campanella suffered an adverse employment action, Plaintiffs must demonstrate a causal connection between that action and the Plaintiffs' protected activities.  *Morris*, 196 F.3d at 110.  "The causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action."  *Id.*  That is to say, Plaintiffs must show that "the adverse employment action would not have been taken absent the employee's protected speech."  *Id.*  Where "questions regarding an employer's motive predominate in the inquiry regarding how important a role the protected speech played in the adverse employment decision," summary judgment is unwarranted.  *Id.*

A causal connection can be established in two ways.  First, Plaintiffs can show a direct causal connection through evidence of retaliatory animus.  *Id.*  Second, Plaintiffs can show an indirect causal connection through circumstantial evidence.  *Id.*  Circumstantial evidence may include a showing that "the protected activity was followed by adverse treatment in employment."  *Id.*; *see also Gorman-Bakos v. Cornell Coop. Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001) ("[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action.").  There is no "bright line to define the

outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman-Bakos*, 252 F.3d at 554. Indeed, the Second Circuit has avoided drawing a bright line to allow courts "to exercise [their] judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009). That said, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 95 (2d Cir. 2001).

Here, Plaintiffs assert that evidence of both temporal proximity and retaliatory animus establish a causal connection between the alleged adverse employment action and Plaintiffs' protected activities. Plaintiffs' argument on temporal proximity is woefully devoid of detail, *see* ECF No. 69 at 21 ("We respectfully submit that the actions taken by the defendants fall within the timeframes set by [circuit caselaw]."), and Plaintiffs point to inadmissible hearsay, contradicted by the declarant himself, to demonstrate when Defendants became aware of their protected activity. *Compare id.* (describing Deputy Campanella's testimony that, in August 2008, Sergeant Scott Walsh told him that Sheriff O'Flynn and Undersheriff Caiola were monitoring the Leader Security website and thus knew that Ms. Campanella was associated with Dan Greene) *with* ECF No. 60-9, *affidavit of Scott Walsh*, ¶¶ 8 (denying the same). Nonetheless, genuine disputes of material fact exist as to the role the protected speech played in the alleged adverse employment decision.

Even if Plaintiffs cannot meaningfully dispute when each Defendant first learned of Ms. Campanella's association with Leader Security and Dan Greene, the undisputed facts surrounding the timing of the investigation and MOR support an inference of retaliation. There

is no dispute that Defendants initiated and conducted this investigation in May of 2009. *See* ECF Nos. 60-2, ¶¶ 61-67; 69-1, ¶¶ 61-67. There is also no dispute that Defendants issued the MOR on May 14, 2009. ECF Nos. 60-2, ¶ 76; 69-1, ¶ 76; 60-12. Although the parties dispute when Sheriff O'Flynn became aware of Ms. Campanella's association with Leader Security and Dan Greene—Plaintiffs claim Sheriff O'Flynn knew of Ms. Campanella's connection to Dan Greene as early as August of 2008 while Defendants claim O'Flynn did not become aware of it until three months later—there is no dispute that Dan Greene formally announced his candidacy on May 9, 2009. ECF Nos. 60-2, ¶ 17; 69-1, ¶ 17. Thus, regardless of when Sheriff O'Flynn first learned of Ms. Campanella's political association, Defendants conducted this investigation against the background of Greene's formal announcement that he would be challenging Sheriff O'Flynn in the upcoming election.

Further, even assuming the veracity of Defendants' assertion that Sheriff O'Flynn first learned of Ms. Campanella's employment for Greene on October 20, 2008, only five or six months would have passed between Sheriff O'Flynn learning of the protected activity and the Defendants' investigation into Deputy Campanella's gossiping. *See* ECF No. 60-2, ¶¶ 56, 61-67. A reasonable jury could find that amount of time sufficient to show a causal connection between the protected activity and the adverse employment action. *See Espinal*, 558 F.3d at 129 ("[W]e find that the passage of only six months between the [the protected activity] and an allegedly retaliatory beating by [the defendants] . . . is sufficient to support an inference of a causal connection."); *see also Gorman-Bakos*, 252 F.3d at 554 ("[Five months] is sufficient to support an allegation of a causal connection strong enough to survive a summary judgment motion. We are particularly confident that five months is not too long to support such an allegation where plaintiffs have provided evidence of exercises of free speech and subsequent retaliatory actions . . . .").

That possibility is even clearer when considered in conjunction with Plaintiffs' evidence of retaliatory animus.  Plaintiffs point to Sheriff O'Flynn's statement to Deputy Campanella that Ms. Campanella's association with Greene would "put you in a box," *see* ECF No. 69-5 at 4, and Chief Scott asking Deputy Campanella "how is that going to work" and "isn't she afraid that will be a problem" in reference to Ms. Campanella's employment.  *See id.*  Viewed in the light most favorable to Plaintiffs, those statements could indicate that O'Flynn and Scott were unhappy with Ms. Campanella's employment.[7]  Plaintiffs also point to the contrast between Deputy Campanella's first 20 years at MCSO and his final four years there.  Plaintiffs claim that, while Deputy Campanella received no disciplinary charges or unwelcome employment changes during his first 20 years at MCSO, he encountered multiple disciplinary charges and unwelcome employment changes during his final four years. *See* ECF No. 60-5 at 2; *see also* ECF No. 69-2, *Declaration of Deputy Campanella*, ¶ 3.  Viewed in the light most favorable to Plaintiffs, a reasonably jury could find that this change supports Plaintiffs' argument of retaliation.  On balance, that evidence is sufficient to allow a reasonable jury to find a causal connection between the investigation and MOR and Ms. Campanella's political association.

### iii.    Non-Retaliatory Reason

Once Plaintiffs have demonstrated a prima facie case, the burden shifts to Defendants to articulate a legitimate, nondiscriminatory reason for the adverse action.  *See St. Mary's Honor Ctr.*, 509 U.S. 502, 506-07 (1993).  Like Plaintiffs' initial burden, Defendants' burden is "not particularly steep."  *Hyek v. Field Support Servs.*, 702 F. Supp. 2d 84, 93 (E.D.N.Y. 2010).  It "is one of production, not persuasion" and "involve[s] no credibility assessment."  *Reeves*, 530 U.S. at 142 (internal quotation marks omitted). "If the employer is able to satisfy that burden, the

---

[7]    Although Sheriff O'Flynn's "box" statement is not itself an adverse employment action, *see infra* Part c.ii., it may be considered evidence of retaliatory intent and personal involvement.  *See Poullard v. McDonald*, 829 F.3d 844, 857 (7th Cir. 2016) ("We must emphasize, however, that an unfulfilled threat of discipline for protected activity, if not actionable itself, may well be relevant evidence of retaliatory intent behind a more concrete adverse action.").

inquiry then returns to the plaintiff, to demonstrate that the proffered reason is a pretext" for retaliation. *United States v. City of New York*, 717 F.3d 72, 102 (2d Cir. 2013). To defeat summary judgment at this stage, Plaintiffs need only show that Defendants were motivated "at least in part" by the prohibited retaliatory animus. *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 156 (2d Cir. 2010).

Here, Defendants have satisfied their burden by pointing to Deputy Campanella's conduct as their legitimate, non-retaliatory reason for conducting the investigation into his gossiping and issuing him an MOR. *See* ECF No. 60-20 at 20. Defendants argue that they investigated Deputy Campanella's gossiping because Deputy Campanella was gossiping and gossiping is against MCSO's code of conduct. *Id.* Indeed, Plaintiffs do not dispute that Deputy Campanella was gossiping, *see* ECF No. 69-1, ¶¶ 61-63, or that gossiping violates MCSO's code of conduct. *See id.* at ¶ 74. Nonetheless, Plaintiffs have satisfied their burden of showing that Defendants were motivated, at least in part, by retaliatory animus.

To demonstrate that Defendants' purported reason for investigating Deputy Campanella—namely, that Deputy Campanella was investigated for gossiping because he was gossiping—is a pretext for retaliation, Plaintiffs point to evidence suggesting that MCSO investigations into gossiping allegations are practically unprecedented and that this investigation in particular was inflated and atypical.

First, to show that gossiping investigations are unusual, Plaintiffs point to the deposition testimony of Lieutenant Tomasetti. *See* ECF No. 69-5 at 6. During his deposition, Lieutenant Tomasetti stated that he could not recall any MSCO investigations into allegations of employee gossiping apart from the investigation of Deputy Campanella. *See* ECF No. 60-10 at 198-200. Although Defendants assert that, on two occasions, other officers received "similar" MORs, *see* ECF Nos. 60-20 at 20; 60-2 ¶ 81; 60-14, Plaintiffs argue that those MORs are not as analogous

as Defendants would have this Court believe.  Plaintiffs note that the first of those MORs was issued almost 20 years ago.  *See* ECF Nos. 69-1, ¶ 81; 60-14.  Further, that MOR describes "disrespectful and insolent" behavior towards the subject's supervisors and charges "insubordination" in addition to gossiping and untruthfulness.  *Id.*   In contrast, Deputy Campanella's MOR only describes conversations in which Deputy Campanella repeated rumors and merely charges "conduct unbecoming" in addition to gossiping and untruthfulness.  *See* ECF No. 60-12.    The second "similar" MOR, Plaintiffs point out, was issued after Deputy Campanella's MOR and describes an incident involving Deputy Campanella and relating to the events at issue in this case.  *See* ECF Nos. 69-1, ¶ 81; 60-14; *see also* ECF No. 69-2, ¶ 25 (indicating that the second "similar" MOR stemmed from recordings Deputy Campanella made of conversations he had with other MCSO officers after he felt Defendants were retaliating against him).

Second, to demonstrate that the manner in which Defendants investigated Deputy Campanella was inflated and atypical, Plaintiffs point to differences between the manner in which Defendants investigated Deputy Campanella and MCSO's standard investigatory practice.  First, Plaintiffs point to evidence that Internal Affairs is typically responsible for investigating allegations of employee misconduct.  *See id.* (citing ECF No. 27-11, *MCSO General Order 21-07*).  Second, Plaintiffs point to evidence that, if an allegation of misconduct is so minor as to not call for the involvement of Internal Affairs, standard MCSO practice is for the subject's supervising officer to handle the disciplinary proceedings.  *See id.* (citing ECF No. 69-3, *Declaration of Thomas W. Burns*, ¶ 10); *see also* ECF No. 11-5 (establishing the procedure of "counseling and coaching," which requires an officer's supervisor to respond to some infractions and violations).  In Deputy Campanella's case, however, neither internal affairs nor Deputy Campanella's direct supervising officer conducted the investigation.  *See* ECF Nos. 60-2, ¶¶ 66-

67. Instead, the Undersheriff instructed the Chief Deputy to do so. *Id.* What is more, Plaintiffs offer evidence that indicates that, when MCSO does investigate instances of employee misconduct, the subject of an interrogation is entitled to warnings under *Garrity v. New Jersey*, 385 U.S. 493 (1967), and union representation. *See id.* (citing ECF No. 69-3, *Declaration of Thomas W. Burns*, ¶¶ 12-13); *see also* ECF No. 27-10. Despite Deputy Campanella's requests, the officers investigating him did not give him *Garrity* warnings or permit the presence of a union representative during their interrogation. *See* ECF No. 27-16. These inconsistencies reasonably support a finding that Defendants were motivated, at least in part, by retaliatory intent.

### iv.    Sheriff O'Flynn's Personal Involvement

Before § 1983 damages are awarded, Plaintiffs must show by a preponderance of the evidence that each defendant was personally involved in the alleged constitutional violations. *Gronowski v. Spencer*, 424 F.3d 285, 293 (2d Cir. 2005). Personal involvement requires "intentional participation" in the challenged conduct "by one who knew of the facts rendering it illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001). "[A]n employer's state of mind is necessarily at issue," and "the jury may rely on circumstantial evidence to support the required inference of retaliatory intent." *Gronowski*, 424 F.3d at 293. While a defendant may not be held liable "merely because he held a position of authority," *see, e.g.*, *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996), the nature of the defendant's position and the responsibilities it entails may amount to circumstantial evidence that the defendant participated in the adverse employment action. *See Gronowski*, 424 F.3d at 293-94.

Defendants argue that summary judgment should be granted on all claims against Sheriff O'Flynn because Plaintiffs admit that they have no evidence that Sheriff O'Flynn was involved in conducting the investigation or issuing the MOR. *See* ECF No. 60-20 at 6. However, while

Plaintiffs admit that they do not have direct evidence of Sheriff O'Flynn's personal involvement in the investigation of Deputy Campanella and subsequent MOR, *see* ECF No. 69-1, ¶¶ 88-89, Plaintiffs point to circumstantial evidence that, considered in the light most favorable to Plaintiffs, gives rise to an inference of Sheriff O'Flynn's involvement.  *See* ECF No. 69-5 at 9-11.   Further, while Plaintiffs admit that Undersheriff Caiola, Chief Scott, and Lieutenant Tomassetti were most directly involved in the investigation and MOR, *see* ECF No. 69-1, ¶¶ 64-66, 77, Plaintiffs assert that Sheriff O'Flynn intentionally participated nonetheless.  *See* ECF No. 69-5 at 9-12.

In determining whether a particular defendant intentionally participated in an adverse employment action, the Second Circuit has relied on circumstantial evidence including statements made by the defendant and the defendant's general job responsibilities.  *See, Gronowski*, 424 F.3d 285, 293-94.  The plaintiff in *Gronowski* brought a First Amendment retaliation action under § 1983 against the Mayor of the City of Yonkers.  *Id.* at 287.  The plaintiff there asserted that the mayor retaliated against her because of her association with the mayor's political opponent.  *Id.* at 287-88.  The plaintiff was first laid-off and then reassigned to a less undesirable position.  *Id.* at 291.  There was no dispute that the mayor's subordinate was most directly responsible for the layoff and reassignment, but the Second Circuit considered whether there was sufficient evidence nonetheless to find that the mayor participated in those actions.  *Id.*

Concluding that there was, the court highlighted four facts:  (1) The mayor was generally "responsible for the placement of individuals in [c]ity positions."  *Id.*  (2) Prior to the layoff, a subordinate proposed to the mayor that they eliminate the plaintiff's position.  *Id.*  (3) Following the layoff, the mayor "issued a directive to restore union employees who had been laid off" and the mayor's subordinate testified that he "probably discussed the reassignment" with "either the

[m]ayor or one of the [m]ayor's close advisors." *Id.* at 293-94. (4) The mayor "expressed unhappiness" with the way the plaintiff's department was being run. *Id.* The Second Circuit concluded that "[t]he jury could reasonably infer from this that the [m]ayor shaped the form that the layoffs eventually took." *Id.* at 293.[8]

Analogous facts are present here. Although Sheriff O'Flynn did not conduct the investigation or issue the MOR, the sheriff is generally involved in employee discipline. Sheriff O'Flynn created the procedures for disciplinary charges and investigations, ECF No. 11-5, and for reporting and investigating alleged acts of employee misconduct. ECF No. 27-11. Those procedures require the results of all investigations to be reported to the sheriff through the undersheriff. *Id.* at 1-2. During the course of the investigation of Deputy Campanella, Sheriff O'Flynn was copied on written communications. ECF No. 27-15. Further, Undersheriff Caiola testified that Chief Scott discussed the results of the investigation with him, ECF No. 60-5, *Deposition of Gary Caiola*, at 161-65, and that "[a]t some point [Undersheriff Caiola] may have had a conversation with the sheriff" about the MOR. *Id.* at 166: 3-5. Finally, viewed in the light most favorable to Plaintiffs, Sheriff O'Flynn's "box" statement could suggest that Sheriff O'Flynn thought Ms. Campanella's association with Dan Greene would affect Deputy Campanella's employment at MCSO. *See* ECF Nos. 60-2, ¶ 58; 69-1, ¶ 58. A reasonable jury could infer from these facts, viewed in the light most favorable to Plaintiffs, that Sheriff O'Flynn intentionally participated in the investigation into Deputy Campanella's gossiping and even shaped the manner in which it unfolded.

---

[8]     District Courts within the Second Circuit have relied on similar circumstantial evidence. *See, e.g.*, *Wallace v. Suffolk County Police Dept.*, 369 F. Supp. 2d 251, 267 (E.D.N.Y. 2005) (denying a motion to dismiss based on lack of personal involvement because the plaintiff alleged that the defendant made implicitly threatening statements and was generally responsible for employment decisions like the one at issue).

### c.  **Plaintiffs' Remaining Alleged Adverse Employment Actions**

Regarding Plaintiffs' remaining alleged adverse employment actions, no genuine disputes of fact exist and Defendants are entitled to summary judgment as a matter of law.

#### i.  **Denial of Overtime**

Plaintiffs' denial of overtime claims fails for two reasons.  First, the denial of overtime does not rise to the level of an adverse employment action because Plaintiffs cannot provided specific instances when Deputy Campanella applied for but did not receive overtime.  *See Rivers v. N.Y. City Hous. Auth.*, 176 F. Supp. 3d 229, 253 (E.D.N.Y. 2016) (finding the plaintiff's "broad, conclusory statements that he was treated differently from his similarly situated co-workers with respect to the provision of overtime" did not raise a genuine issue of material fact regarding "whether the overtime denials constitute adverse employment actions"); ECF Nos. 60-2, ¶ 132 (noting that Deputy Campanella cannot provide dates of specific instances on which he was denied overtime); 69-1, ¶ 132 (admitting the same).  Second, even assuming Deputy Campanella was denied overtime opportunities, Defendants have provided a non-retaliatory reason for doing so, *see* ECF No. 60-2, ¶ 103 ("[The] Firearms Deputy position was developed [on June 12, 2009] to minimize overtime generated by using part-time Firearms Instructors."), and Plaintiffs did not dispute Defendants' explanation.  *See* ECF No. 69-1, ¶ 103 (admitting the same).

#### ii.  **Threat of Retaliation**

Plaintiffs assert that Sheriff O'Flynn telling Deputy Campanella that Ms. Campanella's employment "would put you in a box" itself amounts to an adverse employment action.  That argument also fails.  In the context of a conversation regarding Ms. Campanella's employment and Dan Greene potentially running for Sheriff, Sheriff O'Flynn said to Deputy Campanella, "[T]hat would put you in a box."  ECF Nos. 60-2, ¶ 59; 69-1, ¶ 59.  The Parties dispute the

meaning of Sheriff O'Flynn's statement.   *Compare* ECF No. 60-2, ¶ 60 (interpreting the comment to mean that Ms. Campanella's connection to Leader would "put her in a compromising position" because Ms. Campanella would be running for office as a Republican "on the same ticket as Sheriff O'Flynn while working for Sheriff O'Flynn's opponent")   *with* ECF No. 69-1, ¶ 59 (interpreting the comment to mean that Ms. Campanella's employment would affect Deputy Campanella's employment relationship with MCSO).   But even assuming Plaintiffs' interpretation of Sheriff O'Flynn's statement is correct, the statement itself does not amount to an adverse employment action.

Threats of termination alone are insufficient to constitute adverse employment action. *See Murray v. Town of N. Hempstead*, 853 F. Supp. 2d 247, 269 (E.D.N.Y. 2012) ("[T]hreats of termination cannot, by themselves, constitute an adverse employment action.").   Although such a statement might be sufficient to show constructive discharge, *see Grey v. City of Norwalk Bd. of Educ.*, 304 F. Supp. 2d 314, 324 (D. Conn. 2004) ("[T]hreats of termination alone are sometimes sufficient to show constructive discharge."), Deputy Campanella was not constructively discharged.   After Sheriff O'Flynn made this remark, Deputy Campanella remained employed by MCSO for three years and eight months.   ECF No. 60-2, ¶ 8; 69-1, ¶ 8.   No reasonable jury could find that a reasonable person in Deputy Campanella's shoes would have felt compelled to resign.

### iii.  Removal from the Operation Safe Child Program

Plaintiffs also claim that Defendants removed Deputy Campanella from the Operation Safe Child program in retaliation for their protected activities.   Reassignment of duties can amount to an adverse employment action.   *See Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68-69 (2006) (finding a sufficient evidentiary basis to support the jury's verdict that reassignment "from forklift duty to standard track laborer tasks" would "likely dissuade a

reasonable worker from making or supporting a charge of discrimination").[9]  To constitute an adverse employment action, the reassignment must be "more than de minimis."  *See Davidson v. Chestnut,* 193 F.3d 144, 150 (2d Cir. 1999) (collecting cases).

There is no indication that Deputy Campanella's removal from the Operation Safe Child Program was more than de minimis.  Operating the Operation Safe Child machine involved fingerprinting children, taking their picture, and printing an identification card.  ECF Nos. 60-2, ¶ 91; 69-1, ¶ 91.  It was not a daily—or even typical—duty of Deputy Campanella's.  ECF No. 60-3, 124:13.  When asked how many hours per week he spent operating the Operation Safe Child Machine, Deputy Campanella responded, "That's a good question.  It was a scheduled event, usually on the weekends, so whenever somebody would call and offer for a group I would do it.  I'm not sure."  *Id.*  At any rate, when Deputy Campanella did operate the Operation Safe Child machine, it was still only one discrete duty out of many.  In addition to operating the Operation Safe Child machine, Deputy Campanella was a SWAT Team Leader, *id.* at 45:11, and a firearms instructor.  ECF Nos. 60-2, ¶ 7; 69-1, ¶ 7.  He also taught Senior Citizens Academy, did Fatal Crash Simulations, led health and safety talks, and helped communities establish Neighborhood Watch programs.  ECF Nos. 60-2, ¶ 93; 69-1, 93; *see also* ECF No. 60-3.  Thus, although Defendants removed one discrete duty from his plate, on balance, Deputy Campanella's job duties remained the same.

Plaintiffs seem to suggest that operating the Operation Safe Child machine was significant because of the overtime opportunities it afforded Deputy Campanella.  That argument is unavailing.  As an initial matter, even if removal from the Operation Safe Child program left Deputy Campanella with fewer opportunities for overtime, it is not clear that the accompanying

---

[9]      *Burlington Northern*, like several other cases cited here, is a Title VII retaliation case.  *See Burlington N.*, 548 U.S. at 53.  It is applicable nonetheless.  The Second Circuit has noted that its test for determining whether an employment action is adverse in the context of First Amendment retaliation claims "has always been []equivalent to the standard set forth in *Burlington Northern*."  *Zelnik*, 464 F.3d at 227.

loss of overtime would make the action adverse. *Cf. Brown v. City of Syracuse*, 673 F.3d 141, 151 (2d Cir. 2012) (recognizing that suspension with pay pending an investigation does not, "without more," constitute an adverse employment action and concluding that suspension with pay accompanied by loss of overtime pay did not amount to the requisite "more"). More to the point, there is no evidence to suggest that removal from the Operation Safe Child program actually resulted in fewer overtime opportunities for Deputy Campanella. Many of Deputy Campanella's duties as a CPO afforded him overtime opportunities: Deputy Campanella received overtime for the firearms home safety course he led in the evenings. ECF No. 60-3, 35:12-20. He received overtime for the evenings he spent helping communities establish neighborhood watch programs. *Id.* at 41:16-22. When called out for a SWAT operation outside of his usual work hours, Deputy Campanella received overtime. *Id.* at 45:5-8. Deputy Campanella even picked up road patrol shifts as a CPO, and for those, he received overtime. *Id.* at 99:4-8.

In effect, this reassignment resulted in "the same duties with the same job title at the same rate of pay." *Eiden v. McCarthy*, 531 F. Supp. 2d 333, 352–53 (D. Conn. 2008) (finding reassignment from the Connecticut Department of Environmental Protection's Underground Storage Tank Enforcement Program to its Remediation Program did not constitute an adverse action). After Deputy Campanella was removed from the Operation Safe Child program, only one aspect of his job changed: he was no longer creating identification cards for children on the occasional weekend. No reasonable jury could conclude that an officer of ordinary firmness, who was a SWAT Team Leader and a firearms instructor, and who participated in various other community education and safety programs, would be discouraged from exercising a constitutional right for fear of being removed from portrait and fingerprint duty.

### iv.   Reassignment from CPO to Road Patrol

Plaintiffs also claim that Defendants reassigned Deputy Campanella from his CPO position to a road patrol position in retaliation for Plaintiffs' protected activities.   Even assuming that reassigning Deputy Campanella to road patrol amounts to an adverse employment action and that Plaintiffs have demonstrated a causal connection between it and the protected activities, Defendants are entitled to summary judgment on this issue.   Plaintiffs have not rebutted Defendants' non-retaliatory reason for reassigning Deputy Campanella.   Defendants assert that they reassigned Deputy Campanella from his CPO position to road patrol because MCSO began putting time limits on special assignments.  ECF No. 60-2, ¶ 39.   Plaintiffs do not dispute that. ECF No. 69-1, ¶ 39.   Indeed, MCSO had three CPOs at the time that Deputy Campanella's reassignment was announced, and MCSO announced that all three of those CPO were going to be reassigned.   ECF Nos. 60-2, ¶ 38; 69-1, ¶ 38.   Thus, there is no genuine dispute that Defendants would have reassigned Deputy Campanella even in the absence of Plaintiffs' protected activities.

### v.   Denying Deputy Campanella's Application for the Firearms Position

Finally, Plaintiffs claim that Defendants did not award Deputy Campanella the Firearms Deputy position for which he applied in retaliation for Plaintiffs' protected activities.   That argument also fails.  Plaintiffs have not shown that Defendants' purported non-retaliatory reason for taking this action is pretextual.   Defendants insist that they did not award the position to Deputy Campanella because they instead assigned it to a candidate who received more recommendations.  ECF No. 60-2, ¶¶ 120-21.  Plaintiffs admit the same.  ECF No. 69-1, ¶¶ 120-21.   Here, too, the undisputed facts demonstrate that Defendants would have taken this action even in absence of Plaintiffs' protected activities.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment (ECF No. 60) is GRANTED in part and DENIED in part.  With respect to Plaintiffs' allegation that Defendants conducted an investigation into Deputy Campanella's gossiping and issued a Memorandum of Record in connection with that investigation in retaliation for Ms. Campanella's association with Sheriff O'Flynn's political opponent, summary judgment is DENIED.  With respect to Plaintiffs' other alleged adverse employment actions and protected activity, summary judgment is GRANTED.


IT IS SO ORDERED.

Dated: July 26, 2017
        Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court